Christine L. POUNDS as Independent Executrix of the Estate of Horace E. Pounds and Christine L. Pounds, Appellants,

v.

UNITED STATES of America, Appellee.

No. 22730.

United States Court of Appeals Fifth Circuit.

Jan. 19, 1967.

Dougal C. Pope, Houston, Tex., for appellants.

John B. Jones, Jr., Acting Asst. Atty. Gen., Meyer Rothwacks, Atty., Dept. of Justice, Washington, D. C., James R. Gough, Asst. U. S. Atty., Houston, Tex., David O. Walter, Donald W. Williamson, Lawrence B. Silver, Attys., Dept. of Justice, Washington, D. C., Morton L. Susman, U. S. Atty., Houston, Tex., Richard M. Roberts, Acting Asst. Atty. Gen., Lee A. Jackson, Atty., Dept. of Justice, Washington, D. C., Woodrow Seals, U. S. Atty., John H. Baumgarten, Asst. U. S. Atty., Houston, Tex., for appellee.

Before WISDOM, BELL and AINSWORTH, Circuit Judges.

WISDOM, Circuit Judge:

The Court is asked to decide whether the amount a real estate broker realized upon the division of profits from a sale of land should be treated as capital gain or as ordinary income where the broker-taxpayer's right to share in the profits was based on contract rights in part received for services rendered and in part purchased by the taxpayer.

The trial below was to the district court without a jury. Most of the facts are stipulated. The taxpayer, Horace Pounds,[1] now deceased, was a real estate broker and expert appraiser in Houston, Texas. During the year 1954, the American National Insurance Company, Galveston, Texas, owned a 16 acre tract of land in Houston listed for sale with Jim Elrod, a real estate broker. Pounds did not have a listing on this land. He knew, however, that O. J. Gilson was interested in investing in real estate. Pounds, working through Elrod, arranged for the sale of the 16 acres to Gilson.[2] Neither Gilson nor American National paid any commissions to the two brokers; but in return for their services, Gilson agreed to pay each of them 12½ per cent of any net profits he might make on the land. The day the deal was closed, Pounds purchased Elrod's rights to the possible future profits for $2500.00.

The same day, January 20, 1954, Gilson delivered to Pounds a letter evidencing his obligation under the previous oral agreements. The letter in part provided:

In accordance with our verbal agreement, this letter confirms your interest in the net profits anticipated, if and when they develop, from the property owned by me, as follows: [Property described by metes and bounds.] It is specifically understood and agreed that you do not hold any title interest in the above mentioned properties. It is further agreed that at such time as this property is sold and the total investment has been recovered, including taxes and other expenses which may develop in the interim from its purchase date to the date of sale, such excess as develops to be net profit which shall [sic.] divided, first 25% of the actual net profits shall be remitted as appreciation and remuneration for your efforts in working out all of the details necessary in the consummation of this deal.

In 1958 and 1959, Gilson sold most of the property to the Harris County Flood Control District and the State of Texas. In accordance with the terms of the contract, he paid Pounds $14,481.41, one fourth of the net profits. On their 1959 joint return, Pounds and his wife reported the amount received as a long term capital gain, using a basis of $5000. In 1962 the Commissioner asserted a deficiency on the ground that the taxpayer's collection of 25 per cent of the profits was ordinary income to the taxpayer

---

1. Before oral argument in this case, Horace E. Pounds died. This Court granted Mrs. Pounds' motion that she, as executrix of her husband's estate, be substituted for him as a party appellant. For convenience, however, we refer throughout this opinion to Horace Pounds as the taxpayer.

2. The parties stipulated that the real estate was neither inventory of the taxpayer nor property held by him for sale to customers in the ordinary course of his trade or business.

under Section 61(a) of the Internal Revenue Code of 1954,[3] except for the sum of $2500 representing the amount Pounds paid for Elrod's interest.

The Commissioner concluded that Pounds' interest in the future profits was not a capital asset within the meaning of Section 1221 [4] and that the collection of his 25 per cent interest in the profits was not a sale or exchange within the meaning of Section 1222.[5] Pounds paid the deficiency and sued for a refund. The district court, agreeing with the Commissioner, dismissed the action. We affirm.

There are essential differences between the rights Pounds acquired for the services he rendered and the rights he purchased from Elrod. We deal with the two problems separately.

### I.

We discuss first the 12½ per cent interest in the profits that Pounds received in place of the usual agent's commission.

3. Internal Revenue Code of 1954:
 § 61. Gross income defined.
 (a) *General Definition.*—Except as otherwise provided in this subtitle, gross income means all income from whatever source derived, including (but not limited to) the following items:
 (1) Compensation for services, including fees, commissions, and similar items:

4. § 1221. Capital asset defined.
 For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include—
 (1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;
 (2) property, used in his trade or business, of a character which is subject to the allowance for depreciation provided in section 167, or real property used in his trade or business;
 (3) a copyright, a literary, musical, or artistic composition, or similar property, held by—

A. We start with the fact that this interest was compensation for Pounds' personal service as a real estate agent. As he testified,

 I think that is a good way to express it, finding the land, finding the purchaser, working out the details and taking an interest in the sale of the land or the profits from the sale of the land instead of taking the 5% commission.

And as the letter-agreement explicitly stated, Gilson agreed to give Pounds a share in the profits, if any—

 as appreciation and remuneration for your [taxpayer's] efforts in working out all of the details necessary in the consummation of this deal.

Compensation for services rendered constitutes ordinary income under Section 61(a) of the Code. See Gordon v. Commissioner, 29 T.C. 510, 514 (1957), affirmed 5 Cir. 1958, 262 F.2d 413; Farr v. Commissioner, 11 T.C. 552, 560 (1948), affirmed sub. nom. Sloane

 (A) a taxpayer whose personal efforts created such property, or
 (B) a taxpayer in whose hands the basis of such property is determined, for the purpose of determining gain from a sale or exchange, in whole or in part by reference to the basis of such property in the hands of the person whose personal efforts created such property;
 (4) accounts or notes receivable acquired in the ordinary course of trade or business for services rendered or from the sale of property described in paragraph (1); or
 (5) an obligation of the United States or any of its possessions, or of a State or Territory, or any political subdivision thereof, or of the District of Columbia, issued on or after March 1, 1941, on a discount basis and payable without interest at a fixed maturity date not exceeding one year from the date of issue.

5. § 1222. Other terms relating to capital gains and losses.
 For purposes of this subtitle—
 * * * * *
 (3) *Long-term capital gain.*—The term "long-term capital gain" means gain from the sale or exchange of a capital asset held for more than 6 months, if and to the extent such gain is taken into account in computing gross income.

v. Commissioner of Internal Revenue, 6 Cir. 1951, 188 F.2d 254, 258, 29 A.L.R. 2d 580; Craig M. Smith v. Commissioner, 33 T.C. 465, 485 (1959), affirmed on this issue and reversed on other issues, 8 Cir. 1963, 313 F.2d 724. A real estate agent's ordinary income derived from compensation for personal services in selling land cannot be transmuted into capital gain by measuring its value in terms of possible profits from the sale of the land. Pounds simply had an open transaction involving his commission. The fact that the transaction was not closed until the property was sold in 1958–59 cannot change the character of the transaction. Hort v. Commissioner of Internal Revenue, 1941, 313 U.S. 28, 61 S.Ct. 757, 85 L.Ed. 1168; Gordon v. Commissioner, 29 T.C. at p. 513; Holt v. Commissioner of Internal Revenue, 9 Cir. 1962, 303 F.2d 687, 690. See also Bittker, Federal Income, Estate and Gift Taxation 581 (3d ed. 1964). Cf. Ayrton Metal Company v. Commissioner of Internal Revenue, 2 Cir. 1962, 299 F.2d 741, 749. See generally Miller, Capital Gains Taxation of the Fruits of Personal Effort: Before and Under the 1954 Code, 64 Yale L.J. 1 (1964).

B. The express language of the letter contract negatives any inference that Pounds acquired an interest in the land that could be considered a capital asset. Pounds argues, however, that even though he did not have a legal interest in the land, Gilson held an interest for him in trust. Nothing in their agreement creates a trust relationship or implies the existence of a fiduciary duty. For example, the letter contract establishing Pounds' interest did not restrict Gilson's management of the property in the slightest; Gilson was under no duty to maximize profits or to dispose of the land in a falling market. Pounds had only an *expectancy to share in anticipated net profits from a future sale "if and when* they develop[ed]". (Emphasis added.)

▇▇▇ Pounds' contract right to share in future profits, if any, was "property" in the broad sense of the word. Had Gil-

son refused to honor his obligation *after* the sale, Pounds could have compelled him to do so. Moreover, in certain circumstances contract rights may be capital assets. See, e. g., Commissioner of Internal Revenue v. Ray, 5 Cir. 1954, 210 F.2d 390, cert. denied, 1954, 348 U.S. 829, 75 S.Ct. 53, 99 L.Ed. 654; United States v. Dresser Indus., Inc., 5 Cir. 1963, 324 F.2d 56. But where the taxpayer has only a right to share in the profits that might be realized, that interest cannot be treated as a capital asset. The definition of a capital asset must be narrowly applied and its exclusions interpreted broadly in order to effectuate the congressional purpose underlying the capital gains provision. Capital gains treatment was intended to relieve the taxpayer from the excessive tax burden on gain resulting from a conversion of capital investment. Corn Products Refining Co. v. Commissioner of Internal Revenue, 1955, 350 U.S. 46, 76 S.Ct. 20, 100 L.Ed. 29, reh. den. 350 U.S. 943, 76 S.Ct. 297, 100 L.Ed. 823; Commissioner of Internal Revenue v. P. G. Lake, Inc., 1958, 356 U.S. 260, 265, 78 S.Ct. 691, 2 L.Ed.2d 743.

Following this rationale, the Tax Court has refused capital gain treatment on the disposition of contract rights, the values of which were tied to the value of a capital asset, but which the taxpayer received as compensation for services. In Craig M. Smith, 33 T.C. 465 (1959), the taxpayer was an expert in the commodities market. He operated a business in which he invested customers' money in the commodities market in exchange for a forty per cent share in any profits which might be made. He contended that he and his customers were doing business as a partnership, and that his share of the profit from the investments should be treated as a partner's share of the partnership capital gain. Citing Faroll v. Jarecki, 7 Cir. 1956, 231 F.2d 281, cert. den. 352 U.S. 830, 77 S.Ct. 45, 1 L.Ed.2d 51, the Tax Court rejected this theory: the taxpayer had invested nothing, had no control over management, and had no economic interest in the com-

modities bought and sold (despite the fact that a "Contract of Participation" stated that the parties were "co-owners"). "It seems clear", the court said, that the taxpayer "was receiving a share of the profits in return for its management, and the gains it realized are ordinary income." The Eighth Circuit affirmed. "Co-ownership is not an actual reality unless the co-owner has some genuine right in the property. * * * Its rights were limited to 40% of the profits * * *" Smith's Estate v. Commissioner of Internal Revenue, 1963, 313 F.2d 724.

The realities are more obvious in *Smith* than in the case now before the Court in that Smith continuously managed the property and devoted his day to day skill and effort to increasing its value. The appreciation in value was directly related to the taxpayer's everyday business activity. See Wilkinson v. United States, 1962, 304 F.2d 469, 474, 157 Ct.Cl. 847. Here, on the other hand, the taxpayer completed his services in 1954, and the appreciation in the value of the property between 1954 and 1959 was attributable not to his skill or effort, but to natural forces in the real estate market, or to services rendered by another, or to a combination of the two. In principle however the two cases are similar.

In Merton E. Farr, 11 T.C. 552 (1948) the taxpayer and his family owned certain real estate which they contemplated selling. In consideration for services which the taxpayer had rendered in managing the property, the other members of his family assigned to him their interest in sales proceeds exceeding $182,-000. The realty clearly "constituted a capital asset in the hands of its owners, legal and equitable" and the taxpayer argued that he had a "beneficial interest" in the property. Although the assignment recited that the consideration was for "services heretofore rendered", the instrument also stated that the family considered the property not to be worth in excess of $182,000 at the time the assignment was made. The Tax Court held that the taxpayer acquired no interest in the property owned by the rest of his family. "The assignment in question did not make him the beneficiary of a trust. * * * All the assignment did for petitioner was to provide contingently for payment of his services." Id. at 561. On its face, the assignment was analogous to the agreement in this case. The taxpayer was to take compensation for services, completed at the time of the assignment, in the form of future profits arising from the appreciation of land. The Tax Court found, however, that payment of the proceeds exceeding $182,000 represented compensation for services through the date of the sale. The generation of the excess net profit was not tied as closely to the taxpayer's day to day efforts as was that in *Smith*. The taxpayer could not have had as crucial a role in bringing about the appreciation of the real estate as *Smith* had in parlaying investments in the commodities market. While *Farr* is therefore closer to this case than is *Smith*, the profit sharing still represented compensation for services *through the date of the sale.*

In Strauss v. Commissioner of Internal Revenue, 2 Cir. 1948, 168 F.2d 441, cited by the Tax Court in *Farr*, the facts were comparable with the facts here.

"* * * The taxpayer did not receive for those services any part of the Kodachrome process itself or any right to control the disposition of that process. Rather, he obtained the enforceable promise of the owners of the process that he would be paid for his services a definite portion of the royalties they had the right to receive from the Eastman Kodak Company. That is to say, his 'interest in the process' was never greater than a contract right to be paid certain ascertainable sums of money. From first to last his pay for his services was to be only in money determinable in amount by reference to a royalty agreement covering the process. * * *"

C. We note, in passing, that Pounds, a cash basis taxpayer, made no pretense

of treating his contract right/commission as income in 1954; he did not report the actual or constructive receipt of the commission in 1954. We note too that a serious valuation problem would arise in determining the 1954 value of a right to future profits on real estate under the control of a third person, and that undervaluation would allow income clearly taxable at ordinary rates to be treated improperly as capital appreciation.

\* \* \*

■■ We give weight to the fact that Pounds had no legal or equitable interest in the land; he had only a contingent right to share in future profits, if any, in return for personal services rendered. In these circumstances we must classify his 12½ per cent share of the profits as ordinary income under Section 61(a). In any event the payment Pounds received would be ordinary income since there was no "sale or exchange" as required by Section 1222.

### II.

■ These problems of defining a capital asset do not exist with regard to the 12½ per cent interest in the profits which Pounds purchased from Elrod. His "basis" in the property is fixed by the $2500 purchase price. See section 1012. And unlike the other 12½ per cent interest Pounds held, this interest can in no way be considered compensation for services. It makes no difference that Elrod, the original owner of these rights, acquired them as compensation for services. Once the rights passed from his hands, they lost their character as compensation and became instead an investment by Pounds. The Treasury has recognized this change in the character of a right to receive income as it changes hands. GCM 24849 states:

> Once such rights to income from property or for services are separated from the earner by his act of assignment, they become property rights owned by the purchaser or assignee with a basis in his hands measured by the consider-

ation paid. Cum.Bull. 46–1, p. 66, at 68.

A. There is considerable resemblance between the right Pounds purchased from Elrod and a capital asset. The interest was one that could have become worthless had there been no net profits on the real estate or could have appreciated considerably upon an increase in the market value of the land. He risked capital on the future of the Houston real estate market. The land did in fact appreciate in value, as did Pounds' interest, the value of which was tied directly to the value of the land. In this case, Pounds' interest bore many of the earmarks of the kind of investment for which Congress intended to provide capital gains treatment. See Note, 69 Harv. L.Rev. 737, 741–43 (1956). See generally 3B Mertens, Federal Income Taxation § 22.01 et seq. On the other hand, Pounds had no control over the liquidation of his property. Gilson was free to dispose of the real estate at any time. Therefore capital gain treatment of the amount Pounds realized upon the fulfillment of the contract is not necessary to minimize the tax considerations in a decision to liquidate appreciated property.

B. Even if we should assume that the interest Pounds purchased from Elrod was a capital asset, we should be forced to conclude that the amount Pounds realized when Gilson performed his contractual obligation must be taxed as ordinary income. Section 1222 of the Code defines a long term capital gain as "gain from the *sale or exchange* of a capital asset held for more than 6 months \* \* \*". (Emphasis added.) Congress, however, has never defined the term "sale or exchange". "[N]ot every gain growing out of a transaction concerning capital assets is allowed the benefits of the capital gains tax provision. Those are limited by definition to gains from 'the sale or exchange' of capital assets." Dobson v. Commissioner of Internal Revenue, 1944, 321 U.S. 231–232, 64 S.Ct. 495, 88 L.Ed. 691.[6]

---

6. See generally Zarky, Capital Gains Concepts: What is a "Capital" Asset?

When is there a "Sale or Exchange"? 1959 So.Calif. Tax Inst. 357; Surrey and

We cannot find, in this transaction, a "sale or exchange" within the meaning of the statute. The subject of the sales to the flood control district and the state was not the taxpayer's interest in the net profits, but Gilson's equity in the land, which the taxpayer never owned. First, we point out that the sale or exchange must be the event which gave rise to the gain in question. A mere sale or exchange somewhere in the history of the asset will not do. For example in Pat N. Fahey, 16 T.C. 105 (1951), the taxpayer had bought an interest in a lawyer's contingent fee. The Tax Court held that his subsequent collection of the fee gave rise to ordinary income rather than a capital gain. The court, assuming the interest to be a capital asset, said:

> Petitioner seems to be under the impression that because he purchased his interest in the Parkerson fee, then anything which he collected in excess of the purchase price would be capital gain. Id. at 108.

In the next sentence the court classified the impression as erroneous. In Pat N. Fahey the court cited with approval R. W. Hale, 32 B.T.A. 356, aff'd 1936, 66 App.D.C. 242, 85 F.2d 819. In that case there was a compromise of mortgage notes for less than face value. The court held, "The petitioners did not sell or exchange the mortgage notes and consequently an essential condition expressly required by the statute has not been met and no capital loss has been suffered." 32 B.T.A. at 358. See also Osenbach v. Commissioner of Internal Revenue, 4 Cir. 1952, 198 F.2d 235, 237.

The question, then, is whether the transaction which gave rise to Pounds' gain was a sale or exchange. We hold that it was not. Pounds sold to or exchanged nothing with the Harris County Flood Control District or the State of Texas. In his own right he owned no interest, legal or equitable, in the land itself. Furthermore, he was not a partner or joint venturer with Gilson. None of his capital investment flowed to Gilson or into the property. Pounds had no voice and took no part in the management of the property. See also *Craig M. Smith*. Neither the flood control district nor the state acquired any property from Pounds when they bought the land, and Pounds gave up no interest in real estate to them. If there was a sale or exchange, it must have been between Pounds and Gilson, and its subject must have been Pounds' contract claim against Gilson.

Before the transaction took place, Pounds had an enforceable claim against Gilson, since there had in fact been a profit on the sale of the land. Gilson had $14,481.14. After the transaction, Pounds had the $14,481.14, but Gilson had nothing. In ordinary terms, Gilson fulfilled his contractual obligation to Pounds, thereby extinguishing Pounds' claim against him. The Supreme Court has said that the terms "sale" and "exchange" are to be given their ordinary meaning. Helvering v. William Flaccus Oak Leather Co., 1941, 313 U.S. 247, 61 S.Ct. 878, 85 L.Ed. 1310. And the courts have universally recognized that mere collection of an obligation, purchased or not, does not fit the ordinary meaning of "sale or exchange".

In Galvin Hudson, 1953, 20 T.C. 734, the taxpayers acquired for $11,400 a 14-year old depreciated judgment with a face value of $76,000. Two years later the debtor settled for $21,150. The Tax Court held the gain taxable as ordinary income:

> We cannot see how there was a transfer of property, or how the judgment debtor acquired property as the result of the transaction wherein the judgment was settled. The most that can be said is that the judgment debtor paid a debt or extinguished a claim so as to preclude execution on the judgment outstanding against him. * * *

Warren, The Income Tax Project of the American Law Institute, 66 Harv.L.Rev. 761, 811 (1953); Note, The Element of a Section 117 [1222]. "Sale or Exchange", 53 Colum.L.Rev. 976 (1953).

[I]f the judgment had been transferred to someone other than the judgment debtor, the property transferred would still be in existence after the transaction was completed. * * * In their day-to-day transactions, neither businessmen nor lawyers would call the settlement of a judgment a sale; we can see no reason to apply a strained interpretation to the transaction before us. Id. at 736.

The Sixth Circuit affirmed sub. nom. Ogilvie v. Commissioner of Internal Revenue, 1954, 216 F.2d 748.

In Pat N. Fahey, supra, the Tax Court based its decision on the lack of a sale or exchange:

[The taxpayer] received his part of this $10,500 not as a result of any sale or exchange of his interest in the Parkerson fee but as a collection or settlement of it. That sort of a situation does not bring the gain which he realized * * * within the capital gains provision of section 117 [of the 1939 Code]. 16 T.C. at 109.

Similarly, in Cotlow v. Commissioner of Internal Revenue, 2 Cir. 1955, 228 F. 2d 186, the court held that a taxpayer's receipt of renewal insurance commissions he had purchased from insurance agents was not a sale or exchange. The Supreme Court has declined to find a sale or exchange in the redemption of bonds before maturity by the issuing corporation. Fairbanks v. United States, 1939, 306 U.S. 436, 59 S.Ct. 607, 83 L.Ed. 855. The Court saw no sale or exchange in the recovery of claims against a corporation resulting from fraud in the sale of stock. Dobson v. Commissioner of Internal Revenue, supra. And the Court held there was no sale or exchange of property when a corporation collected insurance proceeds after its fully depreciated real property was destroyed by fire. Helvering v. William Flaccus Oak Leather Co., supra.

Commissioner of Internal Revenue v. Linde, 9 Cir. 1954, 213 F.2d 1, demonstrates nicely the importance of a sale or exchange. There the taxpayer had inherited various interests in proceeds from a cooperative's sales of wine grapes. Part of the payments she received were for sales which had taken place before her decedent's death, while part represented sales occurring after his death. The cooperative, the court ruled, held the grapes in trust for the individual farmers, of whom the taxpayer's decedent was one. Therefore, when the decedent died he left to the taxpayer 1) certain unsold grapes in the possession of the cooperative, and 2) a claim against the cooperative for the proceeds from the grapes already sold. The court held that when the inherited grapes were sold, the taxpayer realized a capital gain. But when she received payment for the sales preceding her husband's death, she realized ordinary income since there had been no sale or exchange.

Congress has clarified the treatment to be accorded many of these ambiguous transactions having some of the characteristics of a sale or exchange but which do not fall clearly within those terms. For example, section 1241 provides that "Amounts received by a lessee for the cancellation of a lease, or by a distributor of goods for the cancellation of a distributor's agreement * * * shall be *considered* as amounts received in exchange for such lease or agreement." (Emphasis added.) Section 1232 directs that amounts received on the retirement of certain bonds or other evidences of indebtedness be *treated* as having been received in exchange for the bonds. Section 302 allows the redemption of stock by a corporation to be treated, in some circumstances, "as a distribution in part or full payment *in exchange* for the stock". (Emphasis added.) See also sections 1233(a), 1234(a), and 1240.

 Although Pounds' transaction with Gilson is somewhat analogous to the transactions for which Congress has provided special treatment, we are not free to treat it as a sale or exchange by analogy. While we hesitate to rely on the silence of Congress in failing specifically to provide for a transaction of this nature, the Supreme Court has held that implication of a sale or exchange is

impermissible. In Helvering v. William Flaccus Oak Leather Co., supra, the Court considered the involuntary conversion of depreciated real property into cash insurance proceeds. After examining the various "sale or exchange" provisions of the 1939 Code, the Court concluded:

> These sections demonstrate that Congress has expressly specified the ambiguous transactions which are to be regarded as sales or exchanges for income tax purposes. They are convincing evidence that the involuntary conversion of respondent's property, which bears far less resemblance to a sale or exchange than the transactions embraced in §§ 115(c), 117(c), and 117(f) is not to be placed in one or the other of those categories by implication. 313 U.S. at 251, 61 S.Ct. at 881, 85 L.Ed. at 1313.[7]

C. If Pounds' interest were considered a capital asset and if it had been sold to a third party shortly before Gilson disposed of the real estate, the income realized from the sale should be taxable at capital gains rates. There are hints to this effect in both Pat N. Fahey, supra, 16 T.C. at 108–109 and in Galvin Hudson, supra, 20 T.C. at 736. But see Commissioner of Internal Revenue v. Phillips, 4 Cir. 1960, 275 F.2d 33.[8] If such a sale should give rise to capital treatment, the result we reach in this case may seem formalistic. There is substance, however, in the distinction between this case and one in which the contract right is sold to a third party. One of the reasons for according special tax treatment to capital transactions is to facilitate the disposal of appreciated property. See Note, 69 Harv.L.Rev. 737, 741–43 (1956). In light of this consideration, our distinction becomes meaningful. Until Gilson sold the real estate, Pounds had complete control over the timing of the realization of income from his interest. Taxation at capital gains rates might have minimized the tax considerations which would have gone into a decision to liquidate his interest or to change the form of his investment. Such taxation might have encouraged him to sell or exchange his contract interest. But once Gilson sold the land, special tax treatment was no longer necessary or even relevant. Pounds had lost control over the timing of his income realization. See the discussion in section II A. of this opinion.

### III.

The taxpayer reported his income on the cash basis. Since the purchase of Elrod's rights was a capital expenditure, the proper year for deduction of their cost is the year in which income is realized from them. See Cotlow v. Commissioner of Internal Revenue, 228 F.2d at 188. The district court was therefore correct in allowing Pounds to deduct the $2500 cost of the purchased rights in 1959. The taxpayer's argument that he is entitled to an additional $2500 deduction representing the cost of the rights he received as compensation for his services is without merit. Since he was on the cash method of accounting, Pounds was not required to take into ac-

7. We consider it important to point out what we do not hold. In some cases the decision whether there was a sale or exchange may be closely related to the determination whether the property in question was a capital asset. See, e. g., *Pat N. Fahey*, supra. We do not reach the conclusion that Pounds' gain was ordinary income because we consider that his interest was not capital in nature. We do not decide that question, but assume for the purpose of decision that the contract right Pounds purchased from Elrod was a capital asset. We rest our holding squarely on the lack of a sale or exchange. Compare Wilkinson v. United States, 1962, 304 F.2d 469, 473, 157 Ct.Cl. 847.

8. *Phillips* may well be distinguishable from the hypothetical. There the taxpayer sold to his law partners an endowment insurance policy a few days before its maturity date. The court apparently treated the partners as mere conduits. See Surrey & Warren, Federal Income Taxation, 660 (1960). Since there was no maturity date in the Pounds-Gilson arrangement, it would be more difficult to find that the sale was for the purpose of producing favorable tax results.

count in 1954 the value of the rights he received then. See Treas.Reg. 1.451–2. Since he made no capital expenditure in order to acquire these rights, he is entitled to no deduction upon the realization of income from them.

There is no merit to Pounds' further argument that he is entitled to deduct one fourth of the amounts Gilson spent on taxes and interest between 1954 and 1959. Pounds contends that if Gilson had not expended these amounts, Pounds' share of the profits would have been correspondingly greater. Pounds had no interest in the real estate. He was not bound to pay the taxes or the interest, and is not entitled to deduct them. Eastern Gas & Fuel Associates v. Commissioner of Internal Revenue, 1 Cir. 1942, 128 F.2d 369, 375; Campbell v. Carter Foundation Prod. Co., 5 Cir. 1963, 322 F.2d 827, 831.

The judgment of the district court is Affirmed.