HARRY A. BURGLASS, Petitioner v. Commissioner OF INTERNAL REVENUE, Respondent
Burglass v. Commissioner
Docket No. 10129-77.
United States Tax Court
T.C. Memo 1979-246; 1979 Tax Ct. Memo LEXIS 279; 38 T.C.M. (CCH) 979; T.C.M. (RIA) 79246; June 27, 1979, Filed *279 Held: petitioner's receipt of a portion of the sale proceeds from certain real estate determined to be received in respect of services, taxable as ordinary income. Held further, petitioner liable for sec. 6653(a) addition to tax for intentional disregard of rules and regulations. Harry A. Burglass, pro se. Alan H. Kaufman, for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Judge: In his notice of deficiency dated June 29, 1977, respondent determined deficiencies in petitioner's income taxes paid, together with additions to tax, for the following taxable years and in the following amounts: Sec. 6651(a)
Taxable Year
Delinquency
Sec. 6653(a)
Ended
Deficiency
Addition
Negligence Addition
Dec. 31, 1970
$939.24
$625.02
$125.00
Dec. 31, 1971
174.00
672.26
134.45
Petitioner has conceded respondent's claimed deficiency of $174 for his taxable year ended December 31, 1971. Petitioner has also conceded the propriety of respondent's claimed section 6651(a) addition to tax for both his taxable years in issue. After other concessions the only issues remaining for our decision are (1) whether petitioner's receipts from a certain transaction *281 are ordinary income or capital gain, and (2) whether petitioner is liable for the section 6653(a) negligence addition to tax for either or both of the taxable years before us. [1] Our decision on the first issue will automatically affect petitioner's allowable medical expense deduction for his taxable year ended December 31, 1970. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Petitioner Harry A. Burglass (Burglass) filed his income tax return (Form 1040) for his taxable year ended December 31, 1970 on March 14, 1974. This return was filed with the Internal Revenue Service Center at Austin, Texas. Petitioner filed his income tax return (Form 1040) for his taxable year ended December 31, 1971 on August 12, 1974. There is no indication *282 in the record with respect to where this return was filed. Both returns reflected the cash basis of accounting. At the time his petition herein was filed petitioner resided in Metairie, Louisiana. Petitioner is an attorney who has practiced law since 1953.From the early 1950's to approximately 1966, petitioner and his brother, Cecil M. Burglass, Jr. (Ceil Burglass or Cecil), also an attorney, were law partners. Sometime prior to August 1964 petitioner and Cecil Burglass become interested in a certain parcel of land in Jefferson Parish, Louisiana.They were recipients of advance information that led them to believe that this land would appreciate quickly in value.Although the two brothers had this knowledge they lacked the funds to capitalize on it, except to the extent that they were able to purchase several small lots in the larger parcel. Thus they sought to interest investors in a plan they originated to develop the land. Among the investors the two brothers contacted was one Stanley W. Ray, Jr. (Ray). Ray agreed to invest in the project. On August 31, 1964 Ray, along with one Charles J. Derbes, Jr. (Derbes), purchased Unit 2, square 35, section A, Pontchartrain Gardens *283 Subdivision in the Parish of Jefferson, Louisiana (Unit 2). Also on August 31, 1964 Ray executed a document entitled "Counterletter and Agreement" evidencing the fact that, while sole record title to Unit 2 was vested in Ray, certain other persons had interests therein. This counterletter and agreement said in relevant part: Ceil M. Burglass Jr. has been instrumental in assisting in the acquisition of the property and the consummation of the purchase. In truth and in fact, I am only a part owner of the said property, and that the true owners of the property are myself, Charles J. Derbes Jr., John F. Hartmann and Cecil M. Burglass Jr. We are all participating in the purchase of this property as an investment by each of us. * * *
The entire credit [i.e. financed] portion of the purchase price, mentioned above, will be paid equally by myself and Charles J. Derbes Jr. The determination of when the property will be sold will be made by myself, Charles J. Derbes Jr. and John F. Hartmann. When the property is sold, the proceeds of the sale will be handled in the following fashion. There will first be deducted from the proceeds of the sale all facts * * *. Thereafter *284 such funds as remain will be divided on this basis: Charles J. Derbes Jr.
37-1/2%
Stanley W. Ray Jr.
37-1/2%
John F. Hartmann
15%
Ceil M. Burglass Jr.
10%
The ownership of * * * 10% of the property by Cecil M. Burglass Jr. * * * and * * * [his] right to participate in the profits from any sale, on the percentage basis mentioned above, is in consideration of the services of Cecil M. Burglass Jr. in negotiating for the acquisition of the property perity and for the consummation of the purchase * * *. While the counterletter referred only to Cecil Burglass, it was at all times understood between the brothers that they were partners in the transactions enumerated therein. Between November 2, 1964 and December 16, 1965, Ray and Derbes purchased lots 5, 8, 9, 10, 12, 13 and 14 of Unit 1, Square 35, section A, Pontchartrain Gardens Subdivision, Parish of Jefferson, Louisiana (Unit 1). On October 8, 1968, Ray executed a second counterletter which read, in pertinent part, as follows: I [Ray] purchased all of the property described hereinabove * * *, for the account of myself and Charles J. Derbes Jr., each of use owning an undivided one-half interest therein, *285 * * * I further acknowledge that Secil M. Burglass Jr. has performed certain services for the account of myself and my co-owner, Charles J. Derbes Jr., in connection with the acquisition of some of the real properties described hereinabove, and a further purpose of this instant counterletter is to establish in Writing the basis for the payment of consideration to Cecil M. Burglass Jr. for his services in this regard. It is agreed that when the properties described hereinabove are sold, whether sold individually or in globo, [sic] there will be paid to Cecil M. Burglas Jr. as income to him and compensation for the services heretofore performed by him a sum of money representing 25% of the net gain realized from the sale of the property for myself and Charles J. Derbes Jr. * * * * * *
It is expressly understood and agreed that the interest of Cecil M. Burglass Jr. herein is not an interest in the real property described hereinabove, but is solely a contingent interest, depending on the net gain, if any, to be realized from the entire transaction. If there is no net gain, Cecil M. Burglass Jr. shall not be entitled to any compensation whatever. * * * Under this counterletter *286 Ray retained to himself the sole discretion to determine when, on what basis, to whom, and how the subject land would be sold. In return for his services Cecil Burglass was to receive 25 percent of the "net gain," as defined, on the sale of Unit 1.
In operating as partners in real estate transactions the brothers' normal procedure was to split their profit 50-50, but their agreement with respect to the profits from Units 1 and 2 was to split them 1/3, 2/3-- petitioner receiving 1/3.On February 1, 1968 Cecil Burglass executed an "acknowledgement" verifying petitioner's 1/3 interest in the proceeds, if any, from the disposition of Unit 1. On August 28, 1969 Cecil Burglass executed a document purporting to evidence Cecil's sale to his mother, Mrs. Ethel C. Burglass, of all his rights, including those previously assigned to petitioner, under the two above mentioned counterletters for $3,500. Ray sold Units 1 and 2 in March of 1970 for $267,022.80. The net profit for distribution to all of the participants in the transaction, including to Cecil Burglass, was $141,035.52. Cecil's participation in these profits, under both counterletters, totaled $21,719.47. Petitioner's share of *287 this amount totaled $7,238.20 which he included in income as long-term capital gain from the sale of real estate. [3] In determining the amount of his claimed gain on the land sale, petitioner showed a zero basis in the real estate. On March 16, 1970 Cecil and Harry Burglass and their mother entered into a document entitled "Instrument of Receipt, Release and Indemnificantion". Noted therein is the fact that Cecil Burglass "was entitled to receive" and "had an interest in" the profits received from the sale of the foregoing described real estate. That document was executed after the sale of the land involved in the two counterletters and before Cecil's interest therein had been distributed to him. At that time Cecil was the defendant in at least two suits for money damages. Ray had been served with a notice of garnishment in these suits and intended to pay Cecil's share of the sales proceeds (including petitioner's portion thereof) into the local court in an interpleader action. The Instrument of Receipt, Release and Indemnification was aimed at obtaining Ray's agreement to pay over to Cecil, petitioner, and their mother, *288 Cecil's share of the sales proceeds (less $9,000 retained to discharge the claims which were the subjects of the two suits against Cecil, which amount was to be placed in escrow).Ray accepted the Burglasses' guarantees as set out in this document and paid $9,000 to an escrow agent and the remainder of Cecil's share of the sale's proceeds to the Burglasses. As previously found petitioner is an attorney employed in his own practice since 1953. He failed to file timely Federal income tax returns for his taxable years 1963 through 1971. During the years in issue petitioner did not have, and never had, a formal accounting method or procedure. He kept no accounts receivable and did not formally bill clients.Instead, his practice was to demand and receive most of his fees "up front." In the usual case amounts received as fees would be deposited in his personal checking account--he maintained no trust account. Receipt of this money would then be marked on the flap of his client's file and perhaps in his checkbook as a deposit or on a checkbook check stub. Sometimes cash would be received as a fee or a fee check would be cashed and not deposited. In such cases petitioner had no reliable *289 procedure or practice to assure that receipt of these payments would be reflected in his income. Petitioner's disbursements would usually be made by check. Often the check would have the purpose of the payment noted thereon. Other payments would be made in cash. Petitioner had no reliable method or procedure for assuring that his business expenditures would be clearly noted as such and recorded for future reference. At the end of any year petitioner would deposit all the papers he believed to be relevant to filing an income tax return in a cardboard box. Each taxable year had its own cardboard box. The contents of each cardboard box were sufficient, in general, to enable an experienced accountant to file an accurate return of petitioner's income for that taxable year. Petitioner was well aware of his obligation to file Federal returns of income and, more specifically, was aware of his legal obligation to file Federal returns for both of the two taxable years before us. On April 15, 1971 petitioner filed an application for extension of time to file for his taxable year ended December 31, 1970. This application stated as the reason petitioner needed an extension that: The *290 taxpayer was involved in a land transaction of approximately $7,000, and he needs additional time in which to obtain the precise figures so as to make an accurate tax return. The application requested an extension to May 15, 1971. We have found that petitioner did not file his 1970 Federal income tax return until March 14, 1974. No comparable application was filed for petitioner's taxable year ended December 31, 1971 and that taxable year's return was not filed until August 12, 1974. OPINION The first issue for our decision is the capital or ordinary income quality of the $7,238.20 petitioner received from Stanley W. Ray, Jr. in respect of his brother Cecil's interest in the sale of Units 1 and 2. Petitioner reported this amount as long-term capital gain with a zero cost basis. Thus petitioner postulates that this item of income was the product of a sale or exchange of a capital asset in which he had an ownership interest. Respondent on the other hand argues that the full amount received was paid by Ray and Charles J. Derbes, Jr. as compensation for services rendered by the brothers in locating the land and helping arrange the investment transaction, a finder's fee in effect. *291 Petitioner did not favor us with a brief herein which is particularly unfortunate in view of the disorganized nature of his testimony. We have nonetheless attempted to discern his legal arguments in support of his claim on this point from his statements made at the trial herein. These arguments appear to run as follows: Petitioner and his brother Cecil were in partnership. Together they had located the parcel of land constituting the Pontchartrain Gardens Subdivision, Units 1 and 2, determined its valuable potential for development, arranged for investors, and helped obtain favorable zoning. In exchange for these services the two brothers insisted that they be brought into the development plans as participants. Counterletters evidencing the brothers' interest in the parcels, but in which only Cecil participated, were signed. When the land was later sold petitioner received 1/3 of Cecil's share of the proceeds. These proceeds were capital gains in Cecil's hands, and hence to petitioner, because the counterletters show that Cecil possessed an ownership interest in the real property itself.
Recognizing that the counterletters, taken intoto, clearly indicate that Cecil *292 did not have an ownership interest in Units 1 and 2, petitioner then goes on to attempt to show that the Louisiana courts have, by inference, found Cecil's interest in the land to be an interest in real property.That Cecil's interest in the land was an interest in real property and hence a capital asset is demonstrated, argues petitioner, by the fact that the local civil district court for the Parish of Orleans, State of Louisiana enforced certain creditors' liens against Cecil as judicial mortgages. Since under Louisana law judicial mortgages are only enforceable against "immovables", the state court must have found that Cecil's interest was in real estate, which in turn infers that Cecil's interest, and hence petitioner's, was an ownership interest in a capital asset. We assume that petitioner would claim that the sale of the land should thus be imputed to him for purposes of determining the character of his gain therefrom. While this rather convoluted line of reasoning is certainly an interesting one, it does little to help answer the question before us. The Louisiana court had to deal with the question of who, among several of Cecil's creditors, should participate in the fund *293 Ray had paid into escrow.The quality of Cecil's income as capital or ordinary for Federal income tax purposes was not, and could not be, before it. Even if the state court had specifically dealt with our issue, its extrajurisdictional determination on that point would hardly be binding upon us. Further, we find nothing in the wording of the judgments rendered in the suits against Cecil which would shed the least light on the Louisiana trial court's reasoning behind its judgments. These judgments, copies of which were included in the record, are nothing more than mere conclusions with respect to how the escrow funds should be distributed. There is no mention therein that the state court was making any judgment with respect to the quality of Cecil's interest in the land, if any.It must be remembered that what was before the Louisiana court was not the land, but merely the funds in the hands of an escrow agent against which creditors were moving on the bases of personal claims against Cecil. Finally, we do not see what relevance the state court's decision could have to the proceedings before us, even if it had found Cecil's interest in the Pontchartrain subdivision to be an immovable. *294 A judicial mortgage in Louisiana will attach to both presently owned and subsequently acquired immovables. La. Civ. Code Ann. art. 3328 (West). The definition of immovables includes incorporeal things such as rights. An incorporeal's status as a movable or immovable depends upon "the object to which [the incorporeal thing] [applies]". La. Civ. Code Ann. art. 470 (West). Examples of incorporeal immovables are "[the] usufruct and use of immovable things" and "[an] action for the recovery of an immovable estate * * *." La. Civ. Code Ann. art. 471 (West). Clearly the value of the usufruct of an immovable is ordinary income if received as compensation for services, yet it could be a right against which a judicial mortgage would lie so as to order in priority the unsecured creditors of the person possessing the right. Thus, even our full concurrence in petitioner's argument, and assuming the relevance of the state court's decision hereto, does not aid his case. From all the evidence, we conclude that Cecil's interest in the Pontchartrain Gardens Subdivision transaction was a mere *295 right to receive a portion of the profits therefrom as compensation for services rendered. The 1968 counterletter is clear in this regard. It concisely states that "the interest of Cecil M. Burglass Jr. [in Unit 1] is not an interest in the real property described hereinabove, but is solely a contingent interest, depending on the net gain" as defined. It also clearly describes the origin of Cecil's claim as performance of certain valuable services in helping Ray and Derbes to acquire Unit 1. Finally it clearly shows that Ray and Derbes were the sole owners of Unit 1. They purchased it for their own accounts. Each owned an undivided one-half interest therein and each paid their share of the mortgage payments and other obligations appurtenant. Ray and Derbes ran the sole risk of loss and possessed in their sole discretion the timing and method of Unit 1's disposition. In sum, Cecil, and derivatively petitioner, possessed none of the rights, benefits and burdens of ownership in Unit 1. To the contrary, they possessed merely the right to be paid for services rendered when, and if, the land was sold and assuming there was any net profit left after Ray and Derbes were reimbursed *296 for their costs. While the 1964 counterletter used a different formula of words we think it is to the same affect. This document describes Cecil as being a part owner of Unit 2. It is also clear, however, in indicating that Unit 2 was purchased on Ray and Derbes' credit and that the decisions of when and how to deal with the parcel were left to Ray and Derbes. The 1964 counterletter was not an instrument of transfer. It did not convey anything to Cecil. It purported merely to recognize the unrecorded "fact" that Cecil was an "owner" of Unit 2. Certainly, then, Cecil did not receive anything as a result of the counterletter's execution and indeed had no right to receive anything thereunder. After that counterletter was executed, he could not have sold his "ownership" interest in Unit 2. Once again we must conclude that, although couched in terms of ownership, this counterletter merely evidenced Cecil's contingent right to receive part of any net profit from the disposition of Unit 2 when, and if, Ray decided to dispose thereof. This understanding of their rights in the Pontchartrain Gardens Subdivision transaction was voiced by Cecil and petitioner themselves in the Instrument *297 of Receipt, Release and Indeminification cited in the Findings of Fact. In that paper the parties thereto described Cecil's interests in both Units 1 and 2 as being an interest in the profits from the sale of the land--not as an interest in the land itself. Property, of any sort, received in compensation for services is ordinary income. Section 61(a)(1), section 1.61-2(d), Income Tax Regs., see Gordon v. Commissioner,29 T.C. 510, 514 (1957), affd. 262 F.2d 413 (5th Cir. 1958), Farr v. Commissioner,11 T.C. 552, 560 (1948), affd. sub. nom. Sloane v. Commissioner,188 F.2d 254, 258 (6th Cir. 1951). This is true without regard to how, and by what medium, the compensation is paid. When the taxpayer is on a cash basis, payments for services rendered are includable in income when received. Since Cecil and petitioner received their shares of& the land sale proceeds in 1970, it was includable in their ordinary *298 income at that time. We find this case to be indistinguishable in principle from the case of Pounds v. United States,372 F.2d 342 (5th Cir. 1967). Pounds was a real estate broker. He arranged the sale of some real estate to one Gilson. In exchange for Pounds' agreement not to charge a commission on the sale and in consideration for Pounds' services, Gilson agreed to pay Pounds 12.5 percent of any net profits he might make on the land. Gilson delivered a letter to Pounds, not unlike the counterletters before us, evidencing this obligation. Like Cecil's rights in the counterletters before us, Pounds' rights were compensation to him for his services in finding the opportunity for Gilson to make an investment in the land. Further, like Cecil's interest, Pound's interest was in the "net profits", if any, when the land was sold. All ownership interest in the land remained in Gilson.Five years after Gilson purchased the land he sold it and paid Pounds his share of the net profits. Pounds reported this income as long-term capital gain. The Commissioner asserted a deficiency based on the theory that the amounts paid Pounds were ordinary income for services rendered. *299 In holding for the Commissioner the Fifth Circuit pointed out, as we do here, that compensation for services is ordinary income.[4] See also United States v. Frazell,335 F.2d 487, 489-490 (5th Cir. 1964), Vestal v. United States,498 F.2d 487, 490-491 (8th Cir. 1974). The final question with which we must deal is whether or not petitioner is chargeable with the section 6653(a)[5] 5 percent addition to tax for negligence or intentional disregard of rules and regulations for either or both of the taxable years before us. Petitioner bears the burden of proving that the imposition of this penalty is improper. Potito v. Commissioner,534 F.2d 49, 53 (5th Cir. 1976). *300 Both the section 6651(a) failure to timely file addition to tax and the section 6653(a) addition to tax may be imposed for the same taxable year. Further, the section 6653(a) addition to tax may be imposed for the same reasons that the section 6651(a) addition to tax is imposed. Bagur v. Commissioner,66 T.C. 817, 823-824 (1976). Petitioner has already conceded the section 6651(a) addition to tax for both the taxable years before us. *301 The 5 percent addition to tax is computed on the amount of the "underpayment" of tax for that taxable year. Section 6653(c)(1) defines "underpayment" for section 6653 purposes in terms of a modification of the general section 6211 definition of "deficiency". [6] Specifically, section 6653(c) defines an underpayment for section 6653(a) purposes to be the same as a "deficiency" as defined in sections 6211 "except that, for this purpose, the tax shown on a return referred to in section 6211(a)(1)(A) shall be taken into account only if such return was filed on or before the last day prescribed for the filing of such return, determined with regard to any extension of time for such filing * * *." *302 Clearly, since the returns for the taxable years before us were not timely filed and were not filed within the time specified in any extension fo time for filing, and since there has been no "amount previously assessed" or "rebates"--it follows that the entire amount of tax we find to be due for the years in issue are "underpayments" for section 6653(a) purposes. It is our task, therefore, to determine whether any part of these underpayments was due to negligence or intentional disregard of rules and regulations. Since at least part of these section 6653(a) "underpayments" stem from petitioner's failure to file timely returns, this final issue resolves itself into the quesion of whether or not petitioner failed to file timely returns due to negligence or intentional disregard of rules and regulations. We think it clear that petitioner's nonfeasance was the product of an intentional disregard of rules and regulations. Petitioner has been an attorney since 1953. He testified repeatedly that he was well aware of his obligation to file timely Federal returns of income. He testified that he had many times advised his own clients, some of whom had failed to file returns for many years, *303 of their obligation to file and that it was his practice in such a case immediately to take his clients down to the local Internal Revenue Service office. Corroborating petitioner's candid confession of his knowledge of his legal duty to file timely returns of income was the fact that he filed an application for extension of time to file for his taxable years 1968, 1969, and 1970. Finally, petitioner's decision to stop filing timely income tax returns after 1962 was a volitional policy choice he made "when I couldn't file an accurate return with my brother." The Fifth Circuit has already spoken on this issue: The authorities indicate that the taxpayer also has the burden to show that he did not intentionally disregard rules and regulations. The latter segment of the disjunctive clause is usually brought into play when a taxpayer who is aware or should be aware of a rule or regulation chooses to ignore its requirements. The taxpayer can avoid the penalty by showing no intent to disregard the rule or regulations involved. [Fn. ref. omitted.] [Marcello v. Commissioner,380 F.2d 499, 506 (5th Cir. 1967).] *304 We think it clear that petitioner deliberately made an informed choice to ignore his legal obligation to file timely Federal income tax returns. That such a choice should be made by an attorney-at-law is rendered even more surprising by the clear testimony of one of petitioner's accountants that there was sufficient information in petitioner's cardboard boxes from which accurate returns could be constructed. At the least, therefore, petitioner has failed to show that he had no intent to disregard the rules and regulations requiring timely and accurate filings of returns. We find that part of petitioner's "underpayments" for both the taxable years before us were due to his intentional disregard of the rules and regulations requiring timely filing of returns. Since we have found that the section 6653(a) addition to tax must be imposed herein due to petitioner's intentional disregard of rules and regulations, we find it unnecessary to determine whether or not petitioner was also negligent. Decision will be entered under Rule 155.
Footnotes
1. Petitioner has conceded respondent's adjustments increasing his gross business receipts for his taxable year 1970 by $1,439.33, decreasing his business expenses for that taxable year by $172.38, and has stipulated that he is entitled to the following itemsized deductions for 1970: [SEE TABLE IN ORIGINAL]↩
3. We note that one-third of $21,719.47 is $7,239.82.↩
4. Pounds also had purchased a right to receive a second 12.5 percent of Gilson's net sale proceeds from a second broker. Collection of this 12.5 percent also generated ordinary income because mere collection does not equal a sale or exchange. Pounds v. United States,372 F.2d 342, 351↩ (5th Cir. 1967).
5. SEC. 6653. FAILURE TO PAY TAX. (a) Negligence or Intentional Disregard of Rules and Regulations With Respect to Income * * * Taxes.--If any part of any underpayment (as defined in subsection (c)(1)) of any tax imposed by subtitle A * * * is due to negligence or intentional disregard of rules and regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment. * * *
(c) Definition of Underpayment.--For purposes of this section, the term "underpayment" means-- (1) Income * * * Taxes.--In the case of a tax to which section 6211 (relating to income * * * taxes) is applicable, a deficiency as defined in that section (except that, for this purpose, the tax shown on a return referred to in section 6211(a)(1)(A)↩ shall be taken into account only if such return was filed on or before the last day prescribed for the filing of such return, determined with regard to any extension of time for such filing) * * *.
6. SEC. 6211. DEFINITION OF A DEFICIENCY. (a) In General.--For purposes of this title in the case of income * * * taxes, imposed by subtitles A * * * the term "deficiency" means the amount by which the tax imposed by subtitle A * * * exceeds the excess of-- (1) the sum of (A) the amount shown as the tax by the taxpayer upon his return, if a return was made by the taxpayer and an amount was shown as the tax by the taxpayer thereon, plus (B) the amounts previously assessed (or collected without assessment) as a deficiency, over-- (2) the amount of rebates, as defined in subsection (b)(2), made.↩