111 T.C. No. 13


UNITED STATES TAX COURT


BRIAN L. AND CAROLE J. NAHEY, Petitioners $\underline{v}$.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 8497-96.                    Filed October 21, 1998.


    W, a corporation, sued X for breach of contract and
misrepresentation for failing to complete the
installation of a computer system and sought damages for
lost profits.  X counterclaimed for withheld payments by
W.

    In 1986, P, through his two S corporations, acquired
all of the assets and assumed all of the liabilities of
W, including W's lawsuit against X and X's counterclaim
against W.  W was thereafter liquidated. No part of the
purchase price for W's assets was allocated to the claim
against X.

    In 1992, the lawsuit with X was settled for total
consideration of $6,345,183.  The settlement proceeds
were paid to the S corporations and reported as long-term
capital gain that passed through to P.  R determined that
the settlement proceeds constituted ordinary income.  P
asserts that the lawsuit constituted a capital asset and

that the settlement of the lawsuit constituted a sale or exchange for purposes of the capital gain provisions. <u>Held</u>: The settlement of the lawsuit between the S corporations and X did not constitute a sale or exchange pursuant to sec. 1222, I.R.C., and thus the settlement proceeds received by the S corporations and passed through to P constitute ordinary income.

<u>Robert A. Schnur</u> and <u>Joseph A. Pickart</u>, for petitioners.

<u>George W. Bezold</u> and <u>Christa A. Gruber</u>, for respondent.

JACOBS, <u>Judge</u>: Respondent determined a $185,833 deficiency in petitioners' 1992 Federal income taxes.

The deficiency herein arises from the parties' dispute over the characterization of settlement proceeds from a lawsuit that was brought by a corporation whose assets, including the lawsuit, were purchased by petitioners' two S corporations. The sole issue we must decide is whether the settlement proceeds received by the S corporations (and passed through to petitioners) constitute ordinary income, as respondent contends, or long-term capital gain, as petitioners contend.[1]

All section references are to the Internal Revenue Code as in effect for the year in issue.

---

[1] In their petition contesting respondent's determination that the settlement proceeds received by the S corporations (and passed through to petitioners) constitute ordinary income, petitioners asserted, as an alternative position, that the S corporations should have reported the settlement proceeds as a nontaxable return of capital. In their posttrial brief, petitioners abandoned this alternative argument.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulated facts are incorporated in our findings by this reference.

At the time the petition was filed, petitioners Brian L. and Carole J. Nahey, husband and wife, resided in Hartland, Wisconsin. (All references to petitioner in the singular are to Mr. Nahey.)

Wehr Corporation

Wehr Corporation (Wehr), a Wisconsin corporation, manufactured and distributed a variety of industrial equipment and devices, such as air distribution equipment, high-technology electronics, motor brakes, clutches, and refractory brick presses.

From the mid-1970's until the end of 1986, petitioner held the positions of president, chief executive officer, and member of the board of directors of Wehr.

At the end of 1986, petitioner owned approximately 10 percent of the stock of Wehr, Bruce A. Beda (who is not described in the record) owned an additional 3 percent, and the balance of the stock was owned by members of the Manegold family directly or through trusts established for their benefit.

The Xerox Lawsuit

On December 31, 1983, Wehr contracted with Xerox Corporation (Xerox) to implement and install a fully integrated on-line, closed loop computer system to unite all of Wehr's operational,

managerial, and administrative functions in a real-time manner. Upon installation, this system would have given Wehr a competitive edge in its marketplace, increasing its revenues and profits.

Pursuant to the terms of the contract, which were negotiated by petitioner on behalf of Wehr, Xerox agreed to complete the project by December 31, 1984. During the period in which Xerox was to implement and install the new system, Xerox allowed Wehr to run its (Wehr's) information services systems on Xerox's computers in California on a fee-for-service basis of approximately $70,000 per month.

From the inception of the project, Xerox fell behind schedule and missed target dates. Wehr responded to Xerox's missed target dates by withholding payment of the monthly fee for using Xerox's computer services in California. In January 1985, at which time Wehr estimated that only 1 to 2 percent of the required services had been performed, Xerox warned Wehr that its continued failure to pay would result in the termination of all services. Nonetheless, Wehr still refused to pay, and Xerox terminated all services. At that time, Wehr allegedly owed $652,984.33 to Xerox.

On February 11, 1985, Wehr filed a lawsuit against Xerox in the United States District Court for the Eastern District of Wisconsin, alleging breach of contract, intentional fraud and misrepresentation, and negligent misrepresentation. Although no specific amount of damages was stated, the complaint alleged that

such damages exceeded $5 million. In its answer to the lawsuit, Xerox asserted a counterclaim that Wehr wrongfully withheld payments to Xerox and demanded damages in the amount not yet paid.

Sometime in 1986 while discovery proceeded, a newly appointed Xerox division president visited petitioner in Milwaukee and proposed to settle Wehr's claim for $1.2 million, although he indicated he could go as high as $2 million. This offer was rejected by petitioner.

Throughout the course of the litigation, petitioner, in his capacity as chief executive officer at Wehr, kept the board of directors and Mr. Manegold (who was chairman of the board) informed about the lawsuit as well as the proposed settlement and its rejection. Petitioner also informed Mr. Manegold that he believed Wehr could recover as much as $10 million from Xerox.

Petitioner's Acquisition of Wehr

During the fall of 1986, Mr. Manegold contacted petitioner and inquired whether he was interested in purchasing Wehr's assets. (Apparently, Mr. Manegold anticipated forthcoming changes in the tax laws that made it advantageous for him and his family to sell Wehr prior to the end of 1986.) Mr. Manegold's asking price was in excess of $100 million, which required petitioner to seek financing.

Petitioner spoke with investment banks about assisting in the purchase of Wehr. The investment banks offered to finance the

acquisition in exchange for control of Wehr--which petitioner opposed. Throughout the discussions with the investment banks, petitioner informed the bankers of the pending lawsuit because of its impact on cash-flows; the lawsuit also appeared in Wehr's financial reports. Petitioner believed Wehr would receive between $2 million and $10 million from the lawsuit against Xerox.

Ultimately, petitioner proposed that Mr. Manegold finance the deal as part of a leveraged buy out (in which petitioner would pledge his shares and use the cash-flows from the corporation to repay the debt and interest). In evaluating the financing possibilities, petitioner analyzed Wehr's cash-flow potential, and included the lawsuit against Xerox in that analysis. Mr. Manegold based the $100 million asking price on a multiple of earnings analysis.

On December 30, 1986, petitioner and Mr. Manegold reached an agreement for the acquisition of Wehr. Petitioner organized two S corporations (hereinafter referred together as the S corporations), Venturedyne, Ltd. (Venturedyne), and Carnes Company, Inc. (Carnes), for the purpose of acquiring Wehr. Pursuant to the acquisition agreement, Venturedyne purchased all the assets and assumed all the liabilities of Wehr, other than those related to the Carnes division of Wehr. All the assets and liabilities of the Carnes division of Wehr were acquired and assumed by Carnes. Through 1992, petitioner owned 97.624190 percent of each of the S

corporations, and the remainder was owned by Mr. Beda. Since the inception of Venturedyne and Carnes, petitioner has served as the chairman of the board of directors, president, and chief executive officer of both entities.

Following the purchase of Wehr's assets and the assumption of Wehr's liabilities by the S corporations, Wehr was liquidated. The S corporations continued to operate the same businesses as operated by Wehr prior to its liquidation.

Among the assets acquired by the S corporations were all lawsuits brought by Wehr, including the claim against Xerox. The liabilities assumed by the S corporations included all lawsuits brought against Wehr, including Xerox's counterclaim. Because the parties to the buy out of Wehr did not allocate the purchase price to specific assets, the S corporations engaged two accounting firms to assist in that process. The accounting firms attempted to determine a value for the Xerox lawsuit, but no value was assigned to Wehr's claim against Xerox because the accountants determined that the value of such claim was "too speculative". Thus, no portion of the purchase price for Wehr's assets was allocated to the Xerox lawsuit, and neither of the S corporations booked the lawsuit as an asset. (However, a footnote in the S corporations' audited financial statements identified the existence of the claim against Xerox.) In a Closing Agreement On Final Determination Covering Specific Matters between the S corporations, petitioners,

Mr. Beda, and the Commissioner, executed on July 1, 1993, no portion of the purchase price was allocated to the Xerox lawsuit.

The Xerox Lawsuit:  Post-1986

Following the buy out of Wehr, the S corporations continued the lawsuit against Xerox in Wehr's name.  The primary disagreement of the parties to that lawsuit during the post-1986 period concerned the nature and extent of the damages caused by Xerox's failure to complete the implementation and installation of the computer system.  The parties fought over: (1) Whether Xerox could examine the S corporations' audited financial statements with respect to the issue of lost profits (even though the damages were alleged only with respect to Wehr); (2) whether Wehr could continue to pursue noncontract claims under the so-called economic loss doctrine; (3) whether Wehr had a duty to mitigate damages following the termination of services by Xerox, and if so, when would the computer system project have been completed if it had been continued by Xerox or another party; and (4) whether Wehr could introduce a new method of calculating damages that produced figures ranging from $20 million to more than $120 million in damages.

In late 1992, the District Court ruled that Wehr could introduce evidence as to the new method of calculating damages at trial; immediately thereafter, Xerox sought to settle the lawsuit. Initially, Xerox offered between $2 million and $3 million, but petitioner responded that he would not accept less than $10

million.   Xerox indicated that it would go no higher than $6 million, and petitioner's counsel, who believed that Xerox's mitigation argument was a strong one, advised petitioner to accept that amount.   The parties eventually agreed to a settlement by which Xerox would pay $5,950,000 in cash and cancel the $395,183 debt owed by Wehr (and assumed by the S corporations) to Xerox, for a total of $6,345,183. The lawsuit was then dismissed with prejudice.   The cash payment was made by Xerox on or before December 31, 1992.

Reporting of the Settlement

The S corporations allocated the settlement with Xerox as follows: $3,502,541 to Venturedyne; $2,842,183 to Carnes.   The S corporations each reported the settlement as long-term capital gain on their respective 1992 corporate income tax returns. Petitioners similarly reported their allocable share of the settlement ($6,194,437) as long-term capital gain on their 1992 joint income tax return.   In calculating the capital gain, neither the S corporations nor petitioners attributed any basis to the lawsuit.

In the notice of deficiency, respondent determined that the settlement proceeds should have been reported as ordinary income.

OPINION

The sole issue for decision herein is whether the proceeds received by the S corporations from the settlement of Wehr's lawsuit against Xerox (the settlement proceeds) should be

characterized as ordinary income or long-term capital gain. The resolution of this issue turns on whether the requirements for obtaining capital gain treatment are satisfied, including whether the settlement of Wehr's lawsuit against Xerox constitutes a "sale or exchange".

The parties center their arguments on the "origin of the claim" test to determine whether the settlement proceeds should be characterized as capital gain or ordinary income. See United States v. Hilton Hotels Corp., 397 U.S. 580 (1970); Woodward v. Commissioner, 397 U.S. 572 (1970); United States v. Gilmore, 372 U.S. 39 (1963); Gidwitz Family Trust v. Commissioner, 61 T.C. 664, 673 (1974); Keller Street Dev. Co. v. Commissioner, T.C. Memo. 1978-350, affd. 688 F.2d 675 (9th Cir. 1982). We, however, shall focus our attention on whether the settlement of the lawsuit constitutes a sale or exchange.

A sale or exchange is a prerequisite to the rendering of capital gain treatment. Sec. 1222; Estate of Nordquist v. Commissioner, 481 F.2d 1058, 1061 (8th Cir. 1973), affg. T.C. Memo. 1972-198; Ackerman v. United States, 335 F.2d 521, 526-527 (5th Cir. 1964); Breen v. Commissioner, 328 F.2d 58, 64 (8th Cir. 1964), affg. T.C. Memo. 1962-230. The phrase "sale or exchange" is not defined in section 1222, but we apply the ordinary meaning to those words. Helvering v. William Flaccus Oak Leather Co., 313 U.S. 247, 249 (1941).

It is well established that a compromise or collection of a debt is not considered a sale or exchange of property because no property or property rights passes to the debtor other than the discharge of the obligation. See Fairbanks v. United States, 306 U.S. 436 (1939); National-Standard Co. v. Commissioner, 749 F.2d 369 (6th Cir. 1984), affg. 80 T.C. 551 (1983); Osenbach v. Commissioner, 198 F.2d 235 (4th Cir. 1952), affg. 17 T.C. 797 (1951); Lee v. Commissioner, 119 F.2d 946 (7th Cir. 1941), affg. 42 B.T.A. 920 (1940); Guthrie v. Commissioner, 42 B.T.A. 696 (1940); Hale v. Commissioner, 32 B.T.A. 356 (1935), affd. sub nom. Hale v. Helvering, 85 F.2d 819 (D.C. Cir. 1936). In this regard, whatever property or property rights might have existed vanish as a result of the compromise or collection. Leh v. Commissioner, 27 T.C. 892, 898 (1957), affd. 260 F.2d 489 (9th Cir. 1958).

On several occasions we have addressed the issue of whether a sale or exchange occurred on the payment of a judgment or the settlement of a claim. See Towers v. Commissioner, 24 T.C. 199 (1955), affd. 247 F.2d 233 (2d Cir. 1957); Hudson v. Commissioner, 20 T.C. 734 (1953), affd. per curiam sub nom. Ogilvie v. Commissioner, 216 F.2d 748 (6th Cir. 1954); Fahey v. Commissioner, 16 T.C. 105 (1951). In Fahey v. Commissioner, supra, we held that where an attorney was assigned an interest in a contingent lawsuit fee in exchange for a cash payment, settlement of the lawsuit and payment of the fee to the attorney did not give rise to capital

gain treatment because no sale or exchange occurred. In reaching our conclusion, we quoted from the opinion of the Court of Appeals for the District of Columbia in Hale v. Helvering, supra (relating to the compromise of a note for less than face value):

> There was no acquisition of property by the debtor, no transfer of property to him. Neither business men nor lawyers call the compromise of a note a sale to the maker. In point of law and in legal parlance property in the notes as capital assets was extinguished, not sold. In business parlance the transaction was a settlement and the notes were turned over to the maker, not sold to him. * * *

Fahey v. Commissioner, supra at 109.[2]

In Hudson v. Commissioner, supra, the taxpayers purchased a 50-percent interest in a judgment from the legatees of an estate, and subsequently the taxpayers settled the judgment with the debtor. The taxpayers reported the payment of the judgment as capital gain. We held that the payment should be characterized as ordinary income, explaining:

> We cannot see how there was a transfer of property, or how the judgment debtor acquired property as the result of the transaction wherein the judgment was settled. The most that can be said is that the judgment debtor paid a debt or extinguished a claim so as to preclude the execution on the judgment outstanding

_____

[2] Our reasoning in Fahey v. Commissioner, 16 T.C. 105 (1951), was followed by the Court of Appeals for the Fifth Circuit in Pounds v. United States, 372 F.2d 342, 349 (5th Cir. 1967), a case relied on by petitioners in support of their argument that the Xerox lawsuit was a capital asset. The Pounds court found that no sale or exchange occurred on the payment of a 12-1/2 percent profit interest in a land deal because following the transaction only one party, the taxpayer, received property (the cash payment).

against him.  In a hypothetical case, if the judgment had been transferred to someone other than the judgment debtor, the property transferred would still be in existence after the transaction was completed.  However, as it actually happened, when the judgment debtor settled the judgment, the claim arising from the judgment was extinguished without the transfer of any property or property right to the judgment debtor.  In their day-to-day transactions, neither businessmen nor lawyers would call the settlement of a judgment a sale; we can see no reason to apply a strained interpretation to the transaction before us.  When petitioners received the $21,150 in full settlement of the judgment, they did not recover the money as a result of any sale or exchange but only as a collection or settlement of the judgment.

Id. at 736.

Despite these and other similar cases[3], petitioners contend that the passing of property or property rights to the debtor is not relevant in determining whether a sale or exchange occurred. In support of this argument, petitioners direct us to Commissioner v. Ferrer, 304 F.2d 125 (2d Cir. 1962), revg. in part and remanding 35 T.C. 617 (1961).  In Ferrer, the taxpayer acquired from an author the right to produce a play (based on the author's book) which included the right to prevent the author's transfer of film rights.  Subsequently, the taxpayer surrendered his rights (the "lease") in exchange for the leading role in a film production. The issue arose as to whether the surrendering of the taxpayer's

---

[3]    The Court of Appeals for the Seventh Circuit, the court to which an appeal in this case lies, has distinguished sales or exchanges from collections and other transactions in which no property or property rights survive.  See Chamberlin v. Commissioner, 286 F.2d 850, 852 (7th Cir. 1960), affg. 32 T.C. 1098 (1959); Lee v. Commissioner, 119 F.2d 946, 948 (7th Cir. 1941), affg. 42 B.T.A. 920 (1940).

rights constituted a sale or exchange for purposes of the capital gain provisions.  In holding that a sale or exchange of the surrendered lease occurred, the Court of Appeals for the Second Circuit stated that Congress was disenchanted with the "formalistic distinction" between a sale of property rights to third parties (which would give rise to capital gain or loss) and the release of those rights that results in their extinguishment (and which would not give rise to capital gain or loss).  The court continued:

> In the instant case we can see no sensible business basis for drawing a line between a release of Ferrer's rights * * * and a sale of them * * *. * * * Tax law is concerned with the substance, here the voluntary passing of "property" rights allegedly constituting "capital assets," not with whether they are passed to a stranger or to a person already having a larger "estate." * * *

Id. at 131.

Petitioners have misread Ferrer and its import.  Ferrer (and the cases cited therein) can be factually distinguished from the instant case because in Ferrer the taxpayer's interest (or lease) to produce the play and prevent the author's transfer of film rights did not disappear but instead reverted to the author after the taxpayer surrendered the lease; whereas in the instant case, the S corporations' rights in the lawsuit vanished both in form and substance upon the receipt of the settlement proceeds.

In the case herein, the S corporations and Xerox settled the lawsuit originally brought by Wehr.  The S corporations received consideration of $6,345,183; Xerox received nothing other than the

discharge of the liability that arose as the result of the lawsuit. We find no discernible distinction between the situation herein and the situations discussed in Fahey v. Commissioner, supra, or Hudson v. Commissioner, supra. In each case, the debtor made payment to the creditor or an assignee of the original creditor in exchange for the extinguishment of the claim. Whether the claim is reduced to judgment before payment is not relevant; ultimately the debtor receives nothing in the form of property or property rights which can later be transferred. Consequently, we hold that the settlement of the lawsuit between the S corporations and Xerox does not constitute a sale or exchange and hence capital gain treatment is not warranted.

Petitioners argue that the so-called Arrowsmith doctrine requires us to apply capital gain treatment to the settlement claim regardless of whether a sale or exchange occurred. We disagree. In Arrowsmith v. Commissioner, 344 U.S. 6 (1952), the Supreme Court held that the characterization of a transaction may require examination of prior, related transactions. In Arrowsmith, the taxpayer-shareholders reported as capital gain the gain realized on the liquidation of their corporation. Subsequently, a judgment was rendered against the former corporation, and the shareholders, as transferees of the corporation's assets, paid the judgment. The Supreme Court held that the payment of the judgment resulted in a capital (rather than ordinary) loss because the judgment was

inextricably related to the capital gain which resulted from the liquidation.

Here, petitioners assert that the receipt of the settlement proceeds is related to a prior transaction, namely the acquisition of Wehr's assets, citing Bresler v. Commissioner, 65 T.C. 182 (1975). In Bresler, the shareholder of an S corporation sought to treat the proceeds from the settlement of an antitrust lawsuit as capital gain, asserting that the settlement was intended to compensate the taxpayer for losses that resulted from the earlier sale of certain properties. We rejected that argument because the earlier sale of the properties resulted in ordinary losses under section 1231, and thus under Arrowsmith v. Commissioner, supra, the settlement proceeds constituted ordinary income.

Petitioners have misapplied the rationale of Arrowsmith and its progeny, including Bresler, to the situation herein. The acquisition of Wehr's assets was not the basis for the lawsuit against Xerox, and the settlement in favor of the S corporations was not related to the leveraged buy out. Cf. West v. Commissioner, 37 T.C. 684, 687 (1962). The origin of the claim in this case was Xerox's breach of contract, as detailed in the complaint filed by Wehr in the District Court. The treatment of the settlement proceeds as ordinary income or capital gain is not dependent on the fact that the S corporations acquired Wehr's

assets in a capital transaction.[4] As such, the <u>Arrowsmith</u> doctrine is inapplicable.

We have considered all of petitioners' other arguments and find them to be not relevant or without merit.

In conclusion, we hold that the settlement of the Xerox lawsuit did not constitute a sale or exchange; consequently, the settlement proceeds constitute ordinary income, not capital gain, to petitioners. Inasmuch as petitioners allocated no part of the purchase price for Wehr's assets to the Xerox lawsuit, they acquired no basis in the lawsuit. Thus, the entire settlement proceeds are includable in gross income.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for respondent</u>.

---

[4] As stated in <u>Fahey v. Commissioner</u>, 16 T.C. at 108, and reiterated in <u>Pounds v. United States</u>, 372 F.2d at 349, the mere occurrence of a sale or exchange of the subject asset at some point in time is not sufficient to obtain capital gain treatment on a later disposition. The sale or exchange must be proximate to the event which gave rise to the gain.