T.C. Memo. 2002-113


UNITED STATES TAX COURT


MARK J. STEEL AND CONNIE J. STEEL, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

ODD-BJORN HUSE AND LISA L. HUSE, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 7338-00, 7453-00.       Filed May 6, 2002.


Deborah A. R. Jaffe and Robert M. McCallum, for petitioners.

Randall E. Heath, for respondent.


MEMORANDUM OPINION

RUWE, Judge:  Respondent determined deficiencies of $2,400
and $56,639 in Mark J. and Connie J. Steel's Federal income taxes
for 1996 and 1997, respectively.  Respondent determined a
deficiency of $7,000 in Odd-Bjorn Huse's Federal income tax for

1996.  Respondent also determined a deficiency of $109,242 in
Odd-Bjorn and Lisa L. Huse's Federal income tax for 1997.  The
issue for decision is whether petitioners are entitled to long-
term capital gain treatment for certain amounts received in
connection with the settlement of a lawsuit.

## Background

The parties submitted this case fully stipulated pursuant to
Rule 122.[1]  The stipulation of facts and the attached exhibits
are incorporated herein by this reference.  Petitioners Mark J.
and Connie J. Steel resided in Redmond, Washington, when they
filed their petition.  Petitioners Odd-Bjorn and Lisa L. Huse
resided in Las Vegas, Nevada, when they filed their petition.[2]

Mr. Huse, Mr. Steel, and Bjorn Nymark were general partners
in Bochica Partners (Bochica), which was formed on October 28,
1994.  Bochica's partnership agreement states that it was formed
for the purpose of acquiring the stock of Birting Fisheries, Inc.
(BFI).  At some point after its formation, Bochica acquired all
the stock of BFI.  BFI was a Washington corporation engaged in
commercial fishing operations in the Bering Sea near Alaska and

---

[1]Unless otherwise indicated, all section references are to
the Internal Revenue Code in effect for the tax years in issue,
and all Rule references are to the Tax Court Rules of Practice
and Procedure.

[2]References to petitioners are to Mr. Steel and Mr. Huse.
Mrs. Steel and Mrs. Huse are parties to these cases by virtue of
the fact they filed joint returns with their husbands for the
years in issue.

in the fishing grounds off the western coast of the United States.

On December 9, 1991, BFI purchased an insurance policy on a commercial fishing vessel, the F/T Ocean Rover (Ocean Rover). The insurer agreed to indemnify BFI for any "loss of hire" damages, including lost profits from operations that might result from a mechanical breakdown. In March and July 1992, the Ocean Rover experienced several breakdowns, and BFI realized a loss of profits. The losses were covered under the insurance policy, and BFI filed a claim with the insurer. In May 1993, the insurer paid $1,024,517 on the claim to BFI, which BFI reported as ordinary income.[3] However, a dispute arose as to the extent of the damages suffered by BFI, and the insurer refused to pay any further amounts on the claim.[4] In September 1995, BFI filed a lawsuit against the insurer alleging a breach of contract, bad faith, and consumer protection violations.

On January 25, 1996, Bochica entered into an agreement with a Norwegian corporation, Norway Seafoods A/S (Norway), for the

---

[3]Any proceeds received by BFI from the insurance claim would have represented ordinary income.

[4]On Dec. 15, 1993, BFI filed a bankruptcy petition pursuant to 11 U.S.C. sec. 362 (1994). The insurance claim survived the bankruptcy proceedings and remained an asset of BFI as of the close of the 1995 tax year. In those proceedings, the insurance claim was assigned a zero value. However, a disclosure statement dated Aug. 22, 1994, noted that "debtor believes that perhaps as much as $1 - 4 million could be recovered on this claim."

sale of 100 percent (1,000 shares) of the common stock of BFI to Norway.[5]  According to the agreement, the purchase price was $9 million.  The parties used an internal financial statement of the assets and liabilities of BFI to arrive at this figure.[6]  The financial statement provided information on the financial status of BFI relevant to December 31, 1995.  As of that date, the value of the lawsuit was not ascertainable, was not listed in the financial statement, and did not figure in the $9 million purchase price.  The agreement states that closing was to occur at a time convenient to the parties, but "will occur not later than February 27, 1996".

The agreement also addresses the disposition of the lawsuit filed in September 1995.  Under the paragraph entitled "Contemplated Transactions Out of the Ordinary Course of Business", it states: "Purchaser acknowledges that the following transactions may occur between the Shareholders and the Company prior to the Closing Date".  A subparagraph then authorizes BFI to assign its rights under the lawsuit to its selling shareholders.

---

[5]The acquisition was structured as a stock sale to preserve BFI's fishing rights, to facilitate the transfer of other assets to Norway, and to provide Norway with the revenues from the "A" fishing season conducted at the beginning of 1996.

[6]The agreement required an adjustment to the purchase price upon the completion of an audited financial statement of the assets and liabilities of BFI.  On June 20, 1996, a final purchase price of $9,325,000 was agreed upon.

On February 15, 1996, Messrs. Huse, Nymark, and Steel, the directors and shareholders of BFI, consented to the assignment of the lawsuit to Ottar, Inc., a corporation in which Messrs. Huse, Nymark, and Steel owned all outstanding stock.  On February 16, 1996, BFI executed an assignment agreement which assigned BFI's rights in the lawsuit to Ottar for the benefit of the individual partners of Bochica.[7]  Neither Bochica nor Ottar reported any tax effects from this transaction.

On the same day as the assignment of the lawsuit, Bochica and Norway closed on the stock sale.  Bochica used its entire basis to compute its gain from the sale of the BFI stock.  Petitioners recognized gain from the sale as part of their distributive share from Bochica.  At the close of BFI's taxable year on July 31, 1996, BFI's earnings and profits exceeded the value of the lawsuit.

Following the assignment of the lawsuit, the Bochica partners were substituted as plaintiffs in the suit against the insurer, and an amended complaint was filed to reflect the change.  In 1996, the insurer paid $172,175 on the insurance claim.  This amount was distributed to the general partners according to their respective interests:

---

[7]BFI was an accrual basis taxpayer, and at the time of the assignment it had not accrued income from the insurance claim except for the May 1993 payment.  No income was accrued since the value of the claim was disputed and could not be ascertained.

|  | Amount | Ownership |
| Partner | Received | Percentage |
| Mr. Huse | $68,870 | 39.68% |
| Mr. Nymark | 68,870 | 39.68 |
| Mr. Steel | 34,435 | 20.64 |
| Total | 172,175 | |

In July 1997, the Bochica partners and the insurer settled the lawsuit for $1.5 million, which was also distributed to the general partners according to their respective interests:

|  | Amount | Ownership |
| Partner | Received | Percentage |
| Mr. Huse | $595,238 | 39.68% |
| Mr. Nymark | 595,238 | 39.68 |
| Mr. Steel | 309,524 | 20.64 |
| Total | 1,500,000 | |

After accounting for expenses of the lawsuit, Mr. and Mrs. Huse and Mr. and Mrs. Steel reported the amounts received in 1996 and 1997 as long-term capital gain on Schedules D, Capital Gains and Losses, of their Forms 1040, U.S. Individual Income Tax Return, in the following amounts:

|  | 1996 | 1997 |
| Mr. Huse | $60,342 | --- |
| Mr. & Mrs. Huse | --- | $557,359 |
| Mr. & Mrs. Steel | 30,001 | 289,827 |

On March 30, 2000, respondent issued notices of deficiency to Mr. and Mrs. Steel for 1996 and 1997, to Mr. Huse for 1996, and to Mr. and Mrs. Huse for 1997, in which he determined:

> We have reduced the amount of the capital gain that you reported by the amounts you received and identified as additional stock proceeds.  It has been determined that

these amounts were actually payments received from an insurance company in settlement of claims and were not proceeds from the sale or disposition of capital assets.  Since they are not sale proceeds they are considered ordinary income.

*       *       *       *       *       *       *

We have increased your ordinary income to include the amounts that you reported on Schedule D as capital gains and identified as additional stock proceeds.  It has been determined that these amounts were actually payments received from an insurance company in settlement of claims and were not proceeds from the sale or disposition of capital assets.  Since they are not sale proceeds they are considered ordinary income.

## Discussion

Respondent determined that the source of the proceeds from the insurance company was the settlement of the lawsuit and that the proceeds were not received as part of a sale or exchange. Petitioners contend that the rights under the lawsuit, including the right to any settlement proceeds, were received as additional consideration from the sale of their BFI stock.

"[N]ot every gain growing out of a transaction concerning capital assets is allowed the benefits of the capital gains tax provision.  Those are limited by definition to gains from 'the sale or exchange' of capital assets." Dobson v. Commissioner, 321 U.S. 231, 231-232 (1944); Pounds v. United States, 372 F.2d 342, 348 (5th Cir. 1967).  A sale or exchange must be shown for a taxpayer to receive long-term capital gain treatment. Nahey v. Commissioner, 111 T.C. 256, 262 (1998), affd. 196 F.3d 866 (7th Cir. 1999).  This requirement is found in section 1222(3), which

defines long-term capital gain as "gain from the sale or exchange of a capital asset held for more than 1 year, if and to the extent such gain is taken into account in computing gross income."  Though the statute does not define what is a sale or exchange, the terms "sale" and "exchange" are given their ordinary meaning.  Helvering v. William Flaccus Oak Leather Co., 313 U.S. 247, 249 (1941).

"It is well established that a compromise or collection of a debt is not considered a sale or exchange of property because no property or property rights passes to the debtor other than the discharge of the obligation."  Nahey v. Commissioner, supra at 262; see also Pounds v. United States, supra at 349 ("And the courts have universally recognized that mere collection of an obligation, purchased or not, does not fit the ordinary meaning of 'sale or exchange'.").  In general, where property or property rights come to an end and vanish, we have held that a sale or exchange has not occurred.  Leh v. Commissioner, 27 T.C. 892, 898 (1957), affd. 260 F.2d 489 (9th Cir. 1958).  In this same line of cases, we recently decided that the settlement of a lawsuit was not a sale or exchange for purposes of section 1222(3).  Nahey v. Commissioner, supra.

In Nahey, two S corporations owned by the taxpayer purchased the assets of a corporation, including a lawsuit with a value that could not be ascertained.  The taxpayer settled the lawsuit

and reported the proceeds received as capital gains.  We upheld the Commissioner's determination that the settlement proceeds were received as ordinary income.  Id. at 266.  Specifically, we held where only one party to an income event receives property, a sale or exchange does not occur.  Id. at 265.

Petitioners attempt to distinguish our holding in Nahey v. Commissioner, supra, on the following basis:

> Although Nahey involved a sale and a contingent claim, in Nahey, the court was faced with a situation in which the purchaser obtained the contingent claim in the sale, and pursued the claim to settlement, rather than the situation which faces this Court, wherein the sellers obtained the claim as part of a transaction in which they disposed of their entire stock interest.

Under petitioners' theory of the case--that they received the lawsuit from Norway in exchange for their stock in BFI--they were as much "purchasers" of the lawsuit as the taxpayer in Nahey.  The only difference was in the consideration used.  In Nahey, the purchasers used cash, whereas petitioners contend that they used stock in this case.  If petitioners are attempting to make a distinction between what was a "sale" in Nahey and what is, purportedly, an "exchange" in this case, we do not believe Nahey is distinguishable on that basis.  Moreover, petitioners emerged from the transactions as the holders of the insurance claim and lawsuit.  They then proceeded to collect on that claim through settlement of the lawsuit.  Those are the facts which this Court found essential in Nahey, and those are the facts which we find

essential in this case.  Whether collectors on claims are "sellers" or "purchasers" in prior transactions is a matter which was irrelevant in Nahey and which is irrelevant in this case, where the taxpayer is entitled to and receives proceeds in collection of a claim or in the settlement of a lawsuit.  Indeed, as in Nahey v. Commissioner, supra at 266 n.4, our focus is on the receipt of settlement proceeds, not on prior or intervening transactions.  See also Nahey v. Commissioner, 196 F.3d at 868-869; Pounds v. United States, supra at 349; Fahey v. Commissioner, 16 T.C. 105, 108 (1951).

On the basis of the statutory mandate of section 1222(3), and our recent opinion in Nahey v. Commissioner, 111 T.C. 256 (1998), we conclude that the settlement of the lawsuit in this case was not a sale or exchange.[8]  Accordingly, the proceeds originating from the settlement of the lawsuit were not received in a sale or exchange.

Petitioners argue that the holding in Nahey v. Commissioner, 111 T.C. 256 (1998), is not applicable to this case, because they

---

[8]In Helvering v. William Flaccus Oak Leather Co., 313 U.S. 247, 251 (1941), the Court stated: "Congress has expressly specified the ambiguous transactions which are to be regarded as sales or exchanges for income tax purposes."  Implicit in this statement is that certain ambiguous transactions are not considered sales or exchanges unless expressly specified by Congress.  Congress has identified several transactions which are to be regarded as sales or exchanges.  See, e.g., secs. 302, 1234(a)(1) and (2), 1234A, 1241, 1271(a)(1).  However, Congress has not identified the settlement of a lawsuit as a sale or exchange for capital gain purposes.

received the lawsuit in exchange for their BFI stock. Petitioners contend that the open transaction doctrine applies, and under that doctrine the sale or exchange requirement was satisfied when they received the lawsuit for their stock. They emphasize that the receipt of proceeds in an open transaction is relevant only in establishing the amount realized.

We shall first deal with petitioners' contention that they received the lawsuit in exchange for their stock. As a general rule, a taxpayer is bound by the form of the transaction that he has chosen. Framatome Connectors USA, Inc. v. Commissioner, 118 T.C. 32, 47 (2002); Estate of Durkin v. Commissioner, 99 T.C. 561, 571-572 (1992).[9] A taxpayer is ordinarily free to organize his affairs as he sees fit; however, once having done so, he must accept the tax consequences of his choice, whether contemplated or not, and may not enjoy the benefit of some other route he might have chosen but did not. Commissioner v. Natl. Alfalfa Dehydrating & Milling Co., 417 U.S. 134, 149 (1974). In this

---

[9]See also In re Steen, 509 F.2d 1398, 1402 n.4 (9th Cir. 1975):

> As a general rule, the government may indeed bind a taxpayer to the form in which he has factually cast a transaction. The rule exists because to permit a taxpayer at will to challenge his own forms in favor of what he subsequently asserts to be true "substance" would encourage post-transactional tax-planning and unwarranted litigation on the part of many taxpayers and raise a monumental administrative burden and substantial problems of proof on the part of the government. * * * [Citations omitted.]

case, the form of the transactions was a distribution of the lawsuit from BFI to petitioners followed by a sale of stock by petitioners to Norway.

The stock sale agreement states that "Purchaser acknowledges that the following transactions may occur between the Shareholders and the Company prior to the Closing Date." Among the transactions listed under that provision is the authorized assignment of the lawsuit to petitioners: "The Company may transfer to the Shareholders (or their designee) the rights arising out of a lawsuit (the "Lawsuit") commenced by the Company in September 1995". These provisions contemplate a distribution of the lawsuit from BFI to petitioners before the stock sale transaction.

Further, the actual assignment of the lawsuit to petitioners took the form of a distribution from BFI that did not involve Norway. In a document entitled "Written Consent in Lieu of Meeting of Shareholders and Directors", Messrs. Huse, Nymark, and Steel, as directors of BFI, consented to the assignment of the lawsuit. A document entitled "Assignment Agreement", signed by Mr. Nymark, as president of BFI, and Mr. Huse, as president of Ottar, assigned the lawsuit to Ottar for the benefit of petitioners. The form of the assignment was a distribution from BFI to petitioners, not a transfer of the lawsuit by Norway to petitioners for their stock.

Petitioners contend that the distribution of the lawsuit was "integrally related" to the stock sale, and the lawsuit should be treated as received by petitioners as part of the sale of their BFI stock.  Respondent, on the other hand, argues that the distribution of the lawsuit and the sale of the stock were separate transactions.

Assuming arguendo that petitioners are not bound to the form of the transactions chosen, petitioners cannot ignore the unambiguous terms of a binding agreement unless they present "strong proof", which is more than a preponderance of the evidence, that the terms of the written instrument do not reflect the actual intentions of the contracting parties.  Ullman v. Commissioner, 264 F.2d 305, 308-309 (2d Cir. 1959), affg. 29 T.C. 129 (1957); Norwest Corp. & Subs. v. Commissioner, 111 T.C. 105, 142 (1998).  And, generally, where a taxpayer asserts that an allocation of consideration is other than that specified in a contract, we have held that the taxpayer must present "strong proof" that the asserted allocation "is correct based on the intent of the parties and the economic realities."  Meredith Corp. & Subs. v. Commissioner, 102 T.C. 406, 438 (1994).[10]  The

[10]Several Courts of Appeals have applied the more stringent standard enunciated in Commissioner v. Danielson, 378 F.2d 771, 777 (3d Cir. 1967), vacating and remanding 44 T.C. 549 (1965): where a specific allocation of consideration is contained in a written agreement, the taxpayer "may not, absent a showing of fraud, undue influence and the like on the part of the other
(continued...)

strong proof rule applies only in the case of an unambiguous agreement. Gerlach v. Commissioner, 55 T.C. 156, 169 (1970); Estate of Hoffman v. Commissioner, T.C. Memo. 2001-109.

In the stock sale agreement, Norway and petitioners agreed to a $9 million purchase price for the stock. The agreement states: "The Purchase Price for the Shares shall be Nine Million Dollars". The agreement does not disclose any additional consideration owing from Norway to petitioners, except for certain adjustments to be made to the purchase price following the completion of an audited financial statement. Further, the payment terms are very explicit and do not mention the lawsuit or any settlement proceeds. See appendix A. We find that the stock sale agreement was unambiguous regarding the allocation of consideration. The provision of the agreement which authorized the assignment of the lawsuit to petitioners does not treat the lawsuit, or any proceeds therefrom, as additional consideration from Norway. Indeed, that provision and the assignment agreement effectively sever BFI's and Norway's relationship to the lawsuit.

Other documents in the record indicate that the parties did not contemplate that the settlement proceeds be viewed as

---

[10](...continued)
party, challenge the allocation for tax purposes." However, the Court of Appeals for the Ninth Circuit, to which this case is appealable, has yet to adopt this standard. We shall, therefore, apply the strong proof rule. Elrod v. Commissioner, 87 T.C. 1046, 1065-1066 (1986).

additional consideration.  On February 1, 1996, Bochica filed an

affidavit with the State of Washington which was signed by Mr.

Steel as a general partner of Bochica.  That document describes

the acquisition of the BFI stock as follows:

> The purchase price of the shares will be Nine
> Million Dollars ($9,000,000), subject to adjustment to
> reflect the amount of the Company's Net Liability and
> the Company's Net Deferred Taxes, as those terms are
> defined in the Stock Purchase Agreement, as shown by
> post-closing audited financial statements.  In
> addition, Norway Seafoods AS will enter into
> noncompetition agreements with two of the partners of
> BOCHICA Partners.  The consideration for the
> noncompetition agreements will be Three Million Dollars
> ($3,000,000).

No other consideration is cited in that document.  In an

agreement dated June 20, 1996, a final purchase price was

established after adjustments were made under paragraph 2.3 of

the stock sale agreement.  That document states:

> 2.1  Adjustment to Purchase Price.  The parties
> agree that in lieu of any purchase price adjustments
> pursuant to Section 2.3 of the Stock Purchase Agreement
> the purchase price of Nine Million Dollars
> ($9,000,000.00) will be increased to $9,325,000.00, and
> will not be further adjusted.
>
> 2.2  Payment of Escrow Funds.  Within 24 hours of
> the execution of this Agreement by the Parties,
> Purchaser will sign escrow instructions directing the
> Escrow Agent to disburse to BOCHICA Partners the funds
> in the Escrow Account established pursuant to
> subsection 2.2.2 of the Stock Purchase Agreement.
>
> 2.3  Payment of Purchase Price Adjustment.  Within
> five business days of the execution of this Agreement
> by the Parties, Purchaser will pay BOCHICA Partners
> $325,000.00.

The record in this case shows that the only consideration coming

from Norway was the $9 million in cash and the subsequent $325,000 adjustment amount.

Petitioners argue that the distribution of the lawsuit and the stock sale to Norway should be integrated as a single transaction and that the lawsuit should be treated as additional consideration from Norway for their stock. In support of this argument, petitioners state:

> the parties' agreement relative to the distribution of the claim to the selling shareholders was set forth in the Stock Purchase Agreement itself, so there could be no closer relationship between the sale of the stock and the distribution of the rights under the insurance lawsuit.

This alone does not convince us that the distribution should be integrated with the stock transaction. Indeed, petitioners have overemphasized the role that the stock sale agreement played in the rights and obligations "relative" to the lawsuit.

The stock sale agreement merely acknowledged that the assignment of the lawsuit could be made without affecting the overall sales transaction. In fact, the stock sale agreement discusses the assignment of the lawsuit in a paragraph entitled "Contemplated Transactions Out of the Ordinary Course of Business" and provides in a subparagraph thereunder:

> The Company may transfer to the Shareholders (or their designee) the rights arising out of a lawsuit (the "Lawsuit") commenced by the Company in September 1995, * * *; provided that, (i) such rights are assignable; (ii) all steps are taken, including without limitation amending the complaint, so that the Company is no longer a party to the Lawsuit; (iii) the Company

is not obligated in any manner to pursue the Lawsuit; and (iv) the Company is not obligated to execute or file motions, pleadings, affidavits or any other documents in connection with the Lawsuit. If the rights under the Lawsuit are assigned, then the Shareholders agree to indemnify, defend and hold the Company and Purchaser harmless from any and all costs, expenses (including without limitation reasonable attorneys fees), claims, counterclaims, and crossclaims which may arise in connection with, or as a result of, the Lawsuit. Purchaser agrees that it will make reasonable efforts as requested by Shareholders to assist in the Lawsuit; <u>provided that</u>, such assistance does not require Purchaser to incur expense or interrupt the Company's operations. It is expected that the nature of the assistance requested by Shareholders will be to facilitate communication between the Shareholders and persons who were employed by the Company during the times relevant to the lawsuit and to provide reasonable access to and copies of relevant documents.

Similarly, the assignment agreement states that BFI "is contemplating a sale of all of its issued and outstanding stock to Norway". See appendix B. The agreement does not restrict or otherwise condition the assignment of the lawsuit on the sale of the stock to Norway. Conceivably, the assignment or the stock sale might have occurred without the occurrence of the other event. The distribution of the lawsuit and the stock sale may have been interrelated; however, the "closer relationship" that petitioners allude to simply does not exist.

In their petitions to this Court, petitioners allege:

n. Identifying a specific value for the claim at the time Norway Seafoods and BOCHICA Partners were negotiating a price for the sale of the stock, which both sides felt was fair, was difficult, and proved to be a stumbling block to arriving at an agreement for

the sale of the stock in Birting Fisheries, Inc. to Norway Seafoods.

o.   Rather than derailing the entire sale of the stock in Birting Fisheries, Inc., due to their inability to arrive at a value for the claim which would be reflected in the purchase price stated in the Stock Purchase Agreement, Norway Seafoods and BOCHICA Partners agreed that the claim itself would be transferred to the owners of the stock in Birting Fisheries, Inc. who were selling their stock to Norway Seafoods, or to the designee of those shareholders.

p.   The transfer of the claim to or for the benefit of the shareholders of Birting Fisheries, Inc. was intended by the parties to the Stock Purchase Agreement as a solution to the problem of their inability to agree upon the value of the claim for inclusion in the financial statements of Birting Fisheries, Inc. upon which the purchase price was to be based.

Assuming we accept petitioners' statements of fact as true, and that the sale of stock to Norway precipitated the distribution of the lawsuit by BFI, we cannot conclude that these factors require the characterization petitioners suggest.  See Nahey v. Commissioner, 196 F.3d at 869.  If anything, those factors group this case with cases dealing with the distribution of unwanted assets before a stock transaction.  See, e.g., West v. Commissioner, 37 T.C. 684 (1962); Coffey v. Commissioner, 14 T.C. 1410 (1950) (wherein we declined to treat corporate distributions to the taxpayers as part of the purchase price for their stock).

If petitioners are correct that the substance of the transactions herein is the receipt of the lawsuit as part of the BFI stock sale, we must recognize that BFI first distributed the

lawsuit to Norway, and then Norway transferred the lawsuit to petitioners for their BFI stock. This might result in tax consequences to both BFI, see sec. 311(b), and Norway either at the time of the distribution or at the time of the settlement.

In Henry Schwartz Corp. v. Commissioner, 60 T.C. 728, 738-739 (1973), we recognized the interplay of the tax effects of particular transactions and their intended structure, stating:

> In this regard it is important to note that the parties to the agreement, Henry and Sydell and Suval, were dealing at arm's length and indeed had conflicting interests with respect to the treatment of the policy. Thus, if the distribution of the policy was considered as part of the overall price for the stock, and the distribution was from Plastic Calendering to Suval and then to Henry, then Suval might be charged with a dividend on the initial distribution of the policy to it. See Frithiof T. Christensen, 33 T.C. 500, 504-505. On the other hand, if the policy were distributed to Henry by Plastic Calendering, not as part of the purchase price for the stock but simply because the purchaser did not want this asset and the sellers had agreed that it would not be part of the sale, then Henry might be charged with receipt of a dividend. See John R. West, 37 T.C. 684, 687. Thus, the agreement between the parties represents an accurate reflection of an arm's-length transaction, and this agreement makes it clear that the policy was distributed from Plastic Calendering to Suval and then to Henry.

Surely, if petitioners' characterization of the transactions in this case were correct, a reduced purchase price would have been negotiated reflecting BFI's or Norway's tax liability for those amounts. Instead, the purchase price continued to reflect the book value of the assets and liabilities of BFI. It appears from the record that the parties to the stock sale were relatively

sophisticated and would have understood that the tax benefit to one party might result in an adverse tax effect to the other party.[11]  We cannot conclude that the parties contemplated or intended the lawsuit be received by petitioners from Norway as part of the purchase price for their stock.

Petitioners argue that where "simultaneous mutually binding interdependent transactions result in the termination of a shareholder's stock interest in a corporation", the transactions should be integrated, citing In re Steen, 509 F.2d 1398 (9th Cir. 1975); Casner v. Commissioner, 450 F.2d 379 (5th Cir. 1971), affg. in part, revg. in part and remanding T.C. Memo. 1969-98; Smith v. Commissioner, 82 T.C. 705 (1984); and Roth v. Commissioner, T.C. Memo. 1983-651.  On the basis of those cases, petitioners argue that the lawsuit was received in substance as part of the sale of the BFI stock to Norway.  The import of the cases petitioners cite is that on the specific facts presented it

---

[11]In Casner v. Commissioner, 450 F.2d 379, 398 (5th Cir. 1971), affg. in part, revg. in part and remanding T.C. Memo. 1969-98, the Court of Appeals for the Fifth Circuit observed:

> In the instant case, both the selling stockholders and the buying stockholders have denied tax liability for the cash distributions * * * made to the selling stockholders.  However, this Court recognizes that the selling stockholders and the buying stockholders cannot so manipulate their transactions or so frame their transactions as to result in the dividend disappearing with no one taxable for the receipt of the cash dividends or cash distributions.  Under the statute, the cash dividends or cash distributions are inexorably someone's income.

was more appropriate to view the "distribution" as a part of the related stock transaction. However, the facts of those cases are distinguishable from the facts of this case.

In In re Steen, supra at 1403, the Court of Appeals for the Ninth Circuit relied upon a finding that the stock sale agreement stated a reduced purchase price and that this reduction was attributable to a tax contingency provision contained in a related agreement with the purchaser: "Further, the conclusion may be fairly drawn that the tax contingency provision reflects part of the purchase price for assets. Depending upon the taxes paid, the value of those assets and the amount to be paid to the vendors was correspondingly increased or diminished." In the instant case, the purchase price did not correlate to the amounts actually recovered under the lawsuit. Under the stock sale agreement, Norway agreed to pay $9 million to Bochica for the stock. No matter the amount petitioners actually collected on the insurance claim, the purchase price would not be adjusted. Thus, if they collected zero on the lawsuit, Norway's obligation was to remain $9 million. Further, the parties did not agree to any independent means of adjusting the purchase price if the lawsuit was not distributed by BFI.[12]

---

[12]In In re Steen, 509 F.2d 1398 (9th Cir. 1975), the tax contingency payments were paid by the purchaser of the stock. In this case, neither the underlying lawsuit nor any proceeds therefrom originated with Norway, either directly or indirectly.

In Roth v. Commissioner, supra, we applied the step transaction doctrine to integrate a redemption of stock with a sale of stock. An important factor in our decision was that the taxpayer's interest in the corporation was completely terminated simultaneously with the cash distribution. In this case, the assignment of the lawsuit and the stock sale did not occur simultaneously. Bochica and Norway agreed that the contemplated transactions in the stock sale agreement were to occur at different times. The distribution of the lawsuit was to occur at some point before the transfer of the stock to Norway. Further, the transactions were to occur between different parties. The lawsuit was to be transferred in the form of a distribution from BFI to Bochica, and the stock transfer was to be in the form of a sale of the stock by Bochica to Norway. The transactions may have occurred on the same day; however, they were not simultaneous. Indeed, petitioners stipulated that the assignment of the lawsuit occurred "prior to the transfer of stock". In Smith v. Commissioner, supra at 717, we held that certain "commissions" paid to the taxpayer in conjunction with a sale of his stock were received as consideration for that stock.[13] We

---

[13]In Smith v. Commissioner, 82 T.C. 705 (1984), the stock purchase agreement allocated amounts to be paid to the taxpayer between the purchase price for the stock and "commissions due". However, we concluded that the stock sale agreement when construed with a subsequent addendum was ambiguous, and we declined to apply either the standard enunciated in Commissioner

(continued...)

found that the purchasers intended to use the corporation's income as a "financing tool" for a portion of the purchase price of the selling shareholders stock. Id. at 717-718. In this case, there is no evidence to suggest that Norway required the assignment of the lawsuit in order to finance the acquisition of the BFI stock, and the purchase price of the stock was not reduced to reflect the lawsuit's assignment. The transactions in this case were not designed as a "financing tool".

Petitioners also suggest that where the corporation would not have made the distribution but for the stock sale, the transactions should be integrated. Petitioners cite Casner v. Commissioner, supra at 397; however, even Casner requires a closer link to the purchase of stock than petitioners' "but for" test. Indeed, the Court of Appeals for the Fifth Circuit cited a variety of factors to support its view that the distribution and the stock sale transaction should be integrated: (1) The "dividend" distribution and the stock sale depended on one another; (2) the purpose of the distribution was to permit the taxpayers to sell all their stock and for the buying shareholders to finance their purchase of that stock; (3) the parties intended that the distributions be treated as part of the purchase price

---

¹³(...continued)
v. Danielson, 378 F.2d 771 (3d Cir. 1967), or the strong proof rule. Id. at 714-715. In the instant case, we conclude that the strong proof rule applies.

for the stock.  Id. at 397-399.  Those factors are not found on the record in this case.  Although the distribution of the lawsuit and the stock sale were related, they were not interdependent.  The purpose of the distribution in this case was perhaps to accommodate the sale of the stock to Norway; however, the distribution was not a "financing tool" as discussed above. Finally, the record does not show that the parties intended the lawsuit to be received from Norway by petitioners as part of the purchase price for the stock.  Indeed, the various agreements involving petitioners, Norway, and BFI suggest the exact opposite.

To hold that petitioners received the settlement proceeds as additional consideration for their BFI stock would require us to engage in some fictional construct that defies the realities and expectations of the parties to the stock sale transaction.  We shall not engage in such a construct, and we hold that petitioners did not receive the settlement proceeds as additional consideration for their stock, but rather as ordinary income.[14]

Decisions will be entered for respondent.

---

[14]Because we decide that petitioners did not receive the settlement proceeds as part of a sale or exchange, we shall not discuss respondent's alternative arguments that the lawsuit was not a capital asset and that the settlement proceeds were received as part of a dividend distribution from BFI.

APPENDIX A
STOCK SALE AGREEMENT

2.  Purchase and Sale of Shares

2.1  Sale of Shares.  Subject to the terms and conditions set forth in this Agreement, and in consideration for the Purchase Price set forth in Section 2.2 below, Shareholders will sell and deliver to Purchaser at the time of Closing a total of One Thousand (1,000) shares of the Company's Common Stock (the "Shares").  Each Shareholder will sell and deliver to Purchaser the number of Shares set forth opposite such Shareholder's name on Exhibit A hereto and deliver duly endorsed stock certificates or certificates accompanied by executed assignments separate from the certificates.

2.2  Purchase Price.  The Purchase Price for the Shares shall be Nine Million Dollars ($9,000,000.00), subject to the adjustment procedure described in Subsection 2.3 below.  The Purchase Price shall be payable as follows:

2.2.1  One Million Five Hundred Thousand Dollars ($1,500,000.00) in cash, which shall be paid to the Shareholders at Closing;

2.2.2  Two Million Three Hundred Thousand Dollars ($2,300,000.00) in cash, which shall be paid into an escrow account * * * with First Interstate Bank of Washington, N.A. * * * at Closing and be used to pay the balance of the Purchase Price pursuant to Subsection 2.3 below; and

2.2.3  The balance of Five Million Two Hundred Thousand Dollars ($5,200,000.00) shall be paid in accordance with the terms of four (4) promissory notes, each in the form of Exhibit B, made payable to BOCHICA Partners in the following amounts:  $2,063,492.00; $1,031,746.00; $1,031,746.00; and $1,073,016.00, respectively.  The obligations under the Promissory Notes shall be secured by an irrevocable letter of credit in the amount of $5,239,000.00 to be issued by any one of Den norske Bank, Industri & Skipsbanken, Union Bank of Norway, or Christiania Bank og Kreditkasse in a form acceptable to Shareholders, which acceptance shall not be unreasonably withheld.

2.3  Adjustment to Purchase Price.  Upon execution of this Agreement, Shareholders shall instruct the accounting firm

of Stetson Guske & Koenes, P.L.L.C. ("SG&K") to conduct an audit of the Company's financial statements, which audit shall be completed on or before April 30, 1996. The results of the audit * * * shall be reviewed by KPMG Peat Marwick L.L.P. ("KPMG") and, provided that KPMG provides to Purchaser a written report addressed to the Company stating that KPMG has no material disagreement with the balance sheet and income statement portions of the Audited Financial Statements, the Purchase Price shall be adjusted as set forth in Subsections 2.3.1, 2.3.2 or 2.3.3 below (as applicable). In connection with KPMG's review of the Audited Financial Statements, KPMG shall be provided full access to: (i) all of SG&K's working papers relating to the Audited Financial Statements; and (ii) all of the Company's books and records. If KPMG disagrees with the Audited Financial Statements, then the firm of Price Waterhouse shall be retained to conduct an independent audit, and the results of that audit shall be the governing Audited Financial Statements and shall be binding upon the parties. All of KPMG's fees and expenses shall be borne by Purchaser, and all of Price Waterhouse's fees and expenses shall be borne 50% by Shareholders and 50% by Purchaser. Based on the results of the audit, the Purchase Price shall be adjusted as follows:

2.3.1 If the amount of the Company's Net Liability, as reflected in the Audited Financial Statements, is $17,074,829 (i.e., $50,000 more than the Net Liability as reflected in the Balance Sheet) or more, then the Purchase Price shall be reduced by the amount by which the Net Liability, as reflected in the Audited Financial Statements, exceeds $17,024,829. As used in this Section 2.3, "Net Liability" means the amount equal to Total Long Term Debt (excluding Deferred Income Taxes) plus Total Current Liabilities minus Total Current Assets; provided, however, that if the Audited Financial Statements reflect any reserve for the class action litigation, Lane et al v. Birting Fisheries, Inc., which is presently being maintained against the Company in United States District Court under Cause No. C93-827D, then the amount of such reserve shall not be included in Total Current Liabilities in determining Net Liability. "Total Long Term Debt", "Deferred Income Taxes", "Total Current Liabilities", and "Total Current Assets" shall be determined by reference to the balance sheet contained in the Audited Financial Statements.

2.3.2 If the amount of the Company's Net Liability, as reflected in the Audited Financial

Statements, is reflected in the Balance Sheet) or less, then the Purchase Price shall be increased by the amount by which the Net Liability, as reflected in the Audited Financial Statements is less than $17,024,829.

2.3.3  If the amount of the Company's Net Deferred Taxes, as reflected in the Audited Financial Statements, is greater than $4,100,000, then the Purchase Price shall be reduced by the amount by which Net Deferred Taxes exceeds $4,100,000.  As used in this Section 2.3.3, "Net Deferred Taxes" means the amount equal to Deferred Income Taxes less Long Term Deferred Income Tax Assets.  "Deferred Income Taxes" and "Long Term Deferred Income Tax Assets" shall be determined by reference to the balance sheet contained in the Audited Financial Statements.

If the Purchase Price is reduced pursuant to Subsection 2.3.1 above, then, immediately following the receipt of the written approval from KPMG (or the receipt of the audit by Price Waterhouse, as the case may be), the funds in the Escrow Account, less any amounts required by the adjustment required by Subsection 2.3.1 above, shall be disbursed to Shareholders, and the remaining balance in the escrow account shall be disbursed to Purchaser.  If the Purchase Price has been increased pursuant to Subsection 2.3.2 above, then all funds in the Escrow Account shall be disbursed to Shareholders and Purchaser shall, within five (5) business days, pay any remaining portion of the Purchase Price (excluding the portion evidenced by the Promissory Notes) to Shareholders in cash.

APPENDIX B
ASSIGNMENT AGREEMENT

BIRTING FISHERIES, INC., a Washington corporation ("BFI") and OTTAR INC., formerly known as BIRTING, INC., a Washington corporation ("BI") enter into this Assignment Agreement this 16 day of February, 1996.

WHEREAS, BFI has commenced a lawsuit against Richard Chown, an underwriter at Lloyd's London, et al., in United States District Court, Western District of Washington, under Cause No. C95-1350D ("Claim"); and

WHEREAS, BFI is contemplating a sale of all of its issued and outstanding stock to Norway Seafoods A/S, a Norwegian corporation pursuant to the terms and conditions set forth in that certain Stock Purchase Agreement dated January 25, 1996 ("Purchase Agreement").

NOW, THEREFORE, for and in consideration for assignee's assumption of liabilities and future expenses set forth below and other good and valuable consideration, the parties agree as follows:

1.  ASSIGNMENT.  BFI hereby assigns to BI all of BFI's right, title and interest in this Claim however awarded, whether in settlement, trial or appeal.

2.  BI OBLIGATIONS.  BI shall take such steps as may be necessary to remove BFI as a party to the Claim, including, without limitation, amending the complaint.  After the closing date, as that term is defined in the Purchase Agreement, BI agrees that BFI shall have no obligation to pursue the Claim or to execute or file any motions, pleadings, affidavits or any other documents in connection with the Claim.  In the event BI elects to pursue the Claim, BI shall be responsible for the payment of all fees, costs, and expenses (collectively "Expenses") incurred by BI in connection with pursuit of the Claim from and after the closing of the sale of Birting Fisheries, Inc.'s stock by BOCHICA Partners, which Expenses would otherwise be payable by BFI.

3.  DISCRETION OF BI.  BI shall be entitled to pursue the Claim as it sees fit, as determined in its sole discretion, including dropping the Claim.  BFI forever waives any right to participate or be involved in any fashion in the pursuit

of the Claim other than BFI's obligations in Paragraph 4 below.

4.     <u>COOPERATION OF BFI</u>.  BFI agrees to assist BI in pursuing the Claim as set forth in Section 6.4.8 of the Purchase Agreement.

5.     <u>INDEMNIFICATION AND HOLD HARMLESS</u>.  BI shall indemnify, defend and hold BFI harmless from any costs, expenses (including without limitation reasonable attorney fees), claims counterclaims, and crossclaims which may arise in connection with, or as a result of, the Claim.